## Belcher v. Commonwealth.

(Decided March 3, 1933.)

832

J. O. BAKER and R. L. POPE for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At about 2 o'clock p. m., on November 5, 1932, the appellant and defendant, George Belcher, shot and killed Daniel Helton in the town of Wallins, Harlan county, Ky. He was later indicted for murder by the grand jury of that county and at his trial he was convicted and punished by confinement in the penitentiary for life. On this appeal by him from the order of court overruling his motion for a new trial and the judgment pronounced thereon, his counsel argue a number of grounds for reversal, chief among which are: (1) Error of the court in overruling defendant's motion for a continuance; (2) the verdict is flagrantly against the evidence; (3) the admission of improper evidence offered by the commonwealth and the rejection of competent evidence offered by defendant; (4) improper instructions given by the court and its failure to instruct the jury upon the whole law of the case; (5) misconduct of the jury, or of the sheriff having it in charge, by permitting its members to separate after they had been selected and sworn to try the case and before their discharge after rendering its verdict; and (6) newly discovered evidence—each of which will be considered and determined in the order named.

1. About three witnesses for defendant did not answer on the day the case was set for trial, which was December 10, following the killing. Defendant's affidavit setting out their testimony was permitted to be read to the jury as the depositions of the absent witnesses. Their testimony was cumulative with that of others who testified at the trial. Section 189 of our Criminal Code of Practice authorizes the action of the

court in this case, and there is no fact appearing in the record furnishing any reason why that course should not be approved in this case, and so far as this ground is based upon such absent witnesses we find no reason to sustain it.

But in support thereof it is also argued that defendant, during the thirty-five days intervening between the killing and his trial under the indictment, had insufficient time in which to prepare his defense and that the court erred in forcing him into trial because of that fact, and the recent case of Shell v. Commonwealth, 245 Ky. 538, 53 S. W. (2d) 954, is relied on in support of that argument. An examination of that case will show a material distinction between its facts and those in this one. But, no such ground was contained in the motion for a new trial, or in the affidavit filed in support of the motion for a continuance. The only reason set out therein for the continuance was the absence of witnesses whose testimony was material to the defense, and which we have already disposed of. In addition, there had been an examining trial following the homicide and before the return of the indictment. Eminent counsel were employed and appeared at that trial in behalf of defendant, and they also appeared in the same capacity in the circuit court whose judgment is now under review. The witnesses were chiefly local to the town of Wallins, where the killing occurred, and still further circumscribed to within a radius of a few hundred yards around the fatal spot. No effort is made anywhere in the record to point out wherein further time for preparation would have uncovered any additional material fact supporting the defense interposed, or whereby defendant could have strengthened his defense, or disparaged the proof of the commonwealth against him. We, therefore, conclude that this entire ground is without merit.

2. In disposing of ground 2 we will not undertake a seriatim statement of the testimony of any witness, either for the commonwealth or for the defendant, since to do so would unduly lengthen the opinion and would be of no material service to any one. Suffice it to say, that the deceased, Daniel Helton, was the father of Corbitt Helton, the latter of whom married appellant's sister. Some four years before the killing a fight occurred between Corbitt Helton and the appellant, in

which both of them were shot. The bitterness engendered between them growing out of that fight was never permanently healed. On one or two occasions following that encounter and the killing, the parties met and vicious demonstrations were made toward each other, especially by Corbitt Helton toward the appellant, and in which weapons were drawn but no serious results followed. On the day of the killing the deceased came to town where his son Corbitt was at work for some commercial concern, and brought the news to his son that his wife was sick. They arranged for the two to leave and go 'to the sick wife at somewhere about 2 o'clock in the afternoon. In the meantime the deceased had purchased some groceries for the family and deposited them in the home of an old life-long acquaintance, Mrs. Nancy Wilson. The son met his father in front of her house near the time for their agreed departure, where they both briefly conversed with one Silus Osborne, who lived immediately across the street from Mrs. Wilson. Within a few minutes thereafter Corbitt Helton procured the mule that his father had ridden to town, saddled it, and arranged the groceries that his father had bought so that they could be carried by the mule. The son then mounted the mule and started towards the state highway connecting Harlan with Pineville, the latter of which they had to travel to go to 'their destination; the point of starting being upon a street or road about fifty or sixty feet or yards from 'the highway. As they approached near the mouth of that road or street where it entered the highway, they met the appellant, who had crossed the highway from Wells' restaurant, where he had been for about thirty minutes. The place seems not 'to have been in the central part of the town of Wallins, and just why the appellant had spent that much time at that outlying place is not explained, except that he testified he went there to get cigarettes. As we interpret the evidence, he could have seen from that restaurant up the road or street from whence decedent and his son departed when they left from 'the front of the residence of Nancy Wilson.

Opposite the Wells restaurant, as we interpret the testimony, there was another one operated by George Hanks; but only Mrs. Hanks was in it on the fatal occasion. That restaurant was in one of the junctions formed by the Harlan and Pineville highway, and the

road or street entering it and from whence the deceased and his son came. Not far from that restaurant and, perhaps, on the other side of the street, was a signboard made of sheet iron or tin, some six feet long and three or four feet wide, and fastened on posts planted in the ground, but the metal composing it did not extend 'to the ground, leaving a space of about thirty inches from its lower edge to the ground. A number of eyewitnesses testified for the commonwealth that appellant, when deceased approached within twenty or thirty feet of the highway, drew his 44-caliber pistol and shot him without saying a word; that he fired one or 'two other shots into the body of the deceased, who exhibited indications that he was wounded by the first shot. His body careened and he fell to the ground with an exclamation that he was killed. However, he returned the fire of appellant, some of the witnesses saying that he fired his first shot before he fell, or as he fell, and followed it up with others after he had fallen. In the meantime his son, who was riding the mule just behind him, threw his head behind the neck of the mule and drew his pistol and also fired at appellant, who sustained a flesh wound in the hip; but the testimony tends to show that it was done by some other weapon of a smaller caliber than the pistols used by deceased and his son. It is the contention of defendant, and there was some evidence to support it, that the shot that wounded appellant was fired by Silus Osborne from his residence about forty yards from the mouth of the road or street that deceased and his son were traveling.

In testifying, as so generally outlined, the witnesses for the commonwealth did not agree in every detail. For instance, some of them stated that when appellant crossed the street from the Wells restaurant to Hanks' restaurant he slipped along by the side of the latter until he could see up the road or street on which the deceased was approaching. Others did not notice such secretive conduct. Likewise, some of those witnesses testified 'that appellant immediately sought shelter behind the signboard to which we have referred, and fired his first shot from behind it, while others testified that he fired that shot at a distance from the signboard of about five feet, and then went behind it, from whence he did the rest of his shooting, firing in all six times,

thereby emptying his pistol. The eyewitnesses who testified for defendant did not materially differ in their testimony from those testifying for the commonwealth, except some of them said that the deceased attempted to draw his pistol before appellant attempted to draw his, and that both of them shot at about the same time, while some of them who testified for defendant said that deceased fired first. One witness testified for the commonwealth that a short while before the shooting, and while appellant was in the Wells restaurant, some one offered him a drink of liquor, which he declined and said at the time, in substance, that he had an important matter to attend to and could not afford it. Defendant coincided with other eye-witnesses in his behalf in the fact that deceased fired the first shot, and he also stated (but which was heard by no other witnesses) that deceased on discovering his presence upon the fatal scene remarked to his son, ''Get ready Corbitt,'' and immediately drew his pistol, and shot at appellant. It should also not be forgotten that it is extremely coincidental that appellant should start for his home and leave the restaurant where he had been for at least thirty minutes after he had been informed by his cousin that the Heltons were in town and that they were then at a place that could be easily seen from that point, and from whence their departure for their home upon the street intersecting the highway could also be seen. We, therefore, have a case where the jury would have been authorized in returning a verdict of acquittal, based upon appellant's right of self-defense, if it had believed him and his eye-witnesses. Opposing that testimony was that of a greater number of eye-witnesses, as well as some circumstances in the case supporting their testimony. It would be useless to cite the almost unlimited number of our opinions to the effect that under such circumstances it is for the jury to determine the credibility of the witness and that its verdict either the one way or the other should not be disturbed because flagrantly against the evidence when it believed one set and discarded the other. It is, therefore, apparent that this ground is not available to defendant.

3. The admitted and rejected testimony complained of under ground 3, not only concerns matters entirely immaterial, but in many cases no objection was made to that offered by the commonwealth, and like-

838

wise in a majority of instances the ruling of the court rejecting testimony offered by defendant was not followed by an avowal so as to enable us to determine what the answer of the witness would be. But, as stated, and without reciting the items in detail, we have been unable to find a single ruling of the court upon the admission and rejection of testimony where the fact to which it related was of any substantial or material force the one way or the other. Of course, during a long trial, as this one was, and wherein some fifty or sixty witnesses attempted to and did exercise liberal license, many immaterial questions will be propounded, and it is of such that furnishes the entire support for this ground, and for which reason we will dismiss it without further comment, except to say that the court ruled in favor of appellant upon the introduction or rejection of testimony much more frequently than it did against him, the latter rulings (against him) appertaining to immaterial and collateral facts.

4. The whole argument of counsel in support of ground 4 is directed to instructions 2 and 6 given by the court on its own motion. The first criticised one (No. 2) is the manslaughter instruction, and it starts out with this language: "If the jury shall not believe from the evidence that the defendant has been proven guilty as set out in instruction No. 1, but shall believe from the evidence to the exclusion of a reasonable doubt that the defendant in this county and before the finding of the indictment herein," etc. Then follows the definition of "voluntary manslaughter." It is argued that just following the word "evidence" in the first line of the excerpt there should have been inserted the phrase "beyond a reasonable doubt," but which if done would have made the instruction clearly erroneous and to such an extent as would have authorized a reversal of the judgment. In that case the instruction would have required the jury to believe *beyond a reasonable doubt* that appellant had not committed "willful murder" as defined in instruction No. 1 before it could convict him of the lower offense of voluntary manslaughter. The instruction did tell the jury that before they could convict him of voluntary manslaughter they should believe the facts necessary therefor, as set out in that instruction, "to the exclusion of a reasonable doubt." There can be no doubt whatever but that the instruction as given was in due and approved

form and the criticism of it by learned counsel for appellant is without justification.

It is also argued in support of this ground, in criticism of instruction No. 6 (and which is the usual reasonable doubt instruction), that the court should have incorporated therein this or a similar phrase: "The law presumes the defendant to be innocent and the burden is upon the Commonwealth to establish every fact necessary to his conviction beyond a reasonable doubt." In other words the criticism of that instruction is the failure of the court to incorporate in it some language submitting to the jury the usual presumption of innocence. That instruction, as given, says: "If upon the whole case the jury entertains a reasonable doubt from all the evidence of the defendant having been proven guilty, then you should find him not guilty." As so framed the instruction has been uniformly approved in a long list of cases determined by this court, and in some of which we rejected the identical criticism made by counsel in this case, some of the latest of which are: Mink v. Commonwealth, 228 Ky. 674, 15 S. W. (2d) 463, and Brown v. Commonwealth, 198 Ky. 663, 249 S. W. 777, 779. We therefore conclude that this ground must also be and it is denied.

5. It is alleged in the motion for a new trial as one of the grounds therefor that the jury in visiting the scene of the homicide (which was about nine miles from the county seat where the trial was being conducted) was transported in two automobiles, in one of which the sheriff acted as driver, and the other was driven by a member of the jury, and which it is insisted in support of ground 5 was such a separation of the jury as to constitute material and prejudicial error. The ground is supported only by an affidavit of defendant stating the same fact, but it nowhere appears in the record in any manner that the two automobiles were out of sight of each other during that trip, nor that any person conversed with any of its members, or attempted to do so, or even had an opportunity to do so. The provision of the law requiring the jury to be kept together in the trial of such cases (section 244 of the Criminal Code of Practice) is a precautionary measure promulgated for the purpose of protecting its members from outside influences whereby they, as jurors, may be corruptly approached and in-

duced to return a verdict not supported by the testimony heard during the trial. It is required in the interest of fairness and justice, and one relying upon its violation should point out some fact or facts from which it might be inferred that the protection intended by the requirement was violated. Nothing of that kind was done in this case, and for which reason alone we conclude that this ground is without merit.

But, for a second reason this ground is not available in this case, and which is: That a defendant being prosecuted for a crime in which the jury is required to be kept together, if he is apprised of its wrongful separation must manifest that fact to the court immediately upon the acquiring of the information and to then seek at its hands such relief as he may be entitled to. He is not allowed to remain silent and permit the trial to proceed to adverse final determination, and then to manifest the fact for the first time in his motion for a new trial. Such rule of practice was recognized and applied by us in the case of Heck v. Commonwealth, 163 Ky. 518, 174 S. W. 19, and others therein cited. See, also, Black v. Com., 154 Ky. 144, 156 S. W. 1043. In this case appellant, as well as his counsel, knew of the alleged separation in the manner above indicated before the case was submitted to the jury, and before it retired for deliberation, but nothing was done concerning it, nor any effort made to correct the alleged error by discharging the jury and continuing the trial of the prosecution to the next term, or to another day in the same term. The rule as so announced in the Heck Case and others cited therein is an eminently just one, since it requires, of the one entitled to insist on a strict compliance with the law, fairness towards both the court and the opposing litigant, as well as vigilance in the protection of his rights. An opposite ruling would encourage duplicity and enable a litigant to take advantage of it if he was disappointed in the chance he took for a favorable verdict. We, therefore, conclude that this ground is also unavailable.

6. The alleged newly discovered evidence consisted in the affidavits of four witnesses, whom it is made to appear lived in the immediate vicinity of the scene of the homicide. The testimony of some of them was strictly cumulative, and relates to the participation of Silus Osborne in the shooting after it had com-

menced between appellant and the deceased and the latter's son. It would be a work of supererogation for us to cite the many cases wherein we held that a new trial would not ordinarily be granted for subsequently discovered testimony that is merely cumulative and which disposes of two of the alleged discovered witnesses. But, two of the witnesses stated in their affidavits that they heard a conversation between deceased and Silus Osborne just before the shooting. They were young men, one of them being eighteen years of age and the other one a year older, and they stated that they had attended a shooting match somewhere near by and on returning therefrom they passed the houses of Mrs. Wilson and Silus Osborne, across the street from it, and on the sidewalk or in the street they heard the latter say to the deceased, "Yonder is George Belcher," and that deceased then said: "Corbitt will be here in a few minutes, and we are both ready for him, and you be ready when we start, because we are going to end this thing one way or the other and we may need help from you." Neither of those witnesses stated in their affidavits that they had not communicated their testimony to either defendant or his counsel before the conclusion of the trial, nor did they say that they had been absent from their homes in Wallins at any time since the killing. The defendant in his affidavit concerning the newly discovered testimony stated that it "was unknown to him at the time of his trial for the murder of Daniel Helton, and that he could not by the use of ordinary care and diligence discover same." He made no statement of any effort on his part, or that of his counsel, to discover that testimony from the witnesses who lived in the immediate vicinity, nor did any one of his counsel file his affidavit showing that they knew nothing about the existance of such alleged discovered testimony, or that they had made any effort, reasonable or otherwise, to discover it.

We have learned that alleged newly discovered testimony has become a handy and frequently resorted to route by which a convicted offender against the criminal law seeks to avoid a verdict of a jury convicting him, and for that reason this and other courts have adopted the rule, not only that the alleged newly discovered evidence must be of such a nature and character as to clearly indicate that it might produce a different result at another trial wherein it could be

heard by the jury, but also that the one seeking the benefit of it must make a convincing manifestation that he was deprived of it through no fault or dereliction of his own, and to that end he must make it appear that he made, or that there were made on his behalf, reasonably diligent efforts to discover the testimony before the trial but without avail, and which rule was promulgated and followed to escape impositions that might otherwise be imposed upon the court, as well as the injustice that might be visited upon the opposing litigant. Cases from this court sustaining the rule are Russell v. City of Ashland, 159 Ky. 223, 166 S. W. 971, 972; Burgess v. Grief, 101 S. W. 984, 985, 31 Ky. Law Rep. 215; and others cited in those opinions.

In the Russell case the rule was thus announced: "In a case of this kind (newly discovered evidence). it is not sufficient merely to allege that affiant exercised due diligence, but he must allege facts showing that such diligence was exercised. As the affidavit fails to show such facts, we conclude that the court below did not err in refusing a new trial on the ground of newly discovered evidence, which, so far as the record shows, might have been discovered by the slightest inquiry on the part of plaintiff." In the Burgess Case the new trial was sought by an independent action brought pursuant to provisions of the Civil Code of Practice, and in affirming the judgment refusing the new trial we said: "When a new trial is sought on the ground of newly discovered evidence, the petition (motion in this case) should allege the character of diligence exercised to discover the testimony previous to the trial. The mere statement that 'it (newly discovered evidence) could not with reasonable diligence have been discovered and produced at the trial' is not enough." It is also stated in that opinion that it did not appear from anything contained in the record that a different result would have been reached by the jury had the testimony been introduced, and which is also true in this case. A contrary practice would retard courts in dispatching their work and greatly increase their burdens and also costs to litigants, and all at the behest of an easily asserted and unsupported conclusion of a disappointed litigant who can, most generally, readily resurrect a favorable witness who was undiscoverable

(?) by him until after his unsuccessful trial. It is, therefore, of the utmost importance that a bona fide presentation be made by the applicant in accord with the rule supra. Moreover, the alleged overheard conversation stated in the affidavits of the two discovered witnesses is as much susceptible to the interpretation, if not more so, that the deceased and his son contemplated defending themselves against an assault that might be made upon them by the appellant, as that they intended to first assault him. We, therefore, conclude, as was done in the Russell case that, "the mere statement that 'it (newly discovered evidence) could not with reasonable diligence have been discovered and produced at the trial' is not enough." It was also stated in that opinion that it was not made to appear by the record that a different result would have been reached by the jury had the testimony been introduced and which is also true in this case.

Wherefore, for the reasons stated, the judgment is affirmed.