## Noble v. Commonwealth.

(Decided Feb. 23, 1937.)

WILLIAMS & ALLEN for appellant.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Affirming.

At the July term of the Breathitt circuit court, 1934, Sherman Noble, together with James Morris, were

indicted for the murder of Marvin Gross. James Morris was not on trial. At the July term of said court, 1936, Sherman Noble was tried and convicted of voluntary manslaughter and his punishment fixed at confinement in the State Reformatory for five years. He appeals.

His principal ground is that the verdict was not authorized by the evidence, and it was flagrantly and palpably against the evidence. It is strenuously insisted by counsel that the jury overreached its prerogative and lost its head, not because of appellant's guilt as shown in the record from the evidence touching his plea of self-defense and apparent necessity, but rather on account of his attending church on the Sabbath armed with not only one weapon but two. Learned counsel in their interesting and well-prepared brief rely on a number of this court's decisions for reversal, namely, Sayler v. Com., 264 Ky. 53, 94 S. W. (2d) 281; Ellison v. Com., 254 Ky. 208, 71 S. W. (2d) 417; Gill v. Com.,235 Ky. 351, 31 S. W. (2d) 608; Fuson v. Com., 230 Ky. 761, 20 S. W. (2d) 742; White v. Com., 260 Ky. 516, 86 S. W. (2d) 286, where we decided that the verdict was flagrantly against the evidence. We still adhere to that doctrine.

In the case of Miller v. Com., 231 Ky. 527, 21 S. W. (2d) 840, we said that it has been repeatedly written by this court that the jury is the sole judge of the weight of the evidence, and the court is without authority to invade its province except when the verdict is so palpably against the evidence as to shock the conscience of the court. Cf. Jones v. Com., 230 Ky. 24, 18 S. W. (2d) 287; Owens v. Com., 230 Ky. 212, 18 S. W. (2d) 976; Gilbert v. Com., 228 Ky. 19, 14 S. W. (2d) 194.

We have carefully read the evidence given us in the record. It could be said that an opposite verdict might have been reached by the jury had it seen proper to render it. However, we see no reason for this court to say that the verdict is so palpably and flagrantly against the evidence as to shock the conscience of the court.

We find in substance the facts to be as follows: Appellant and deceased, Marion Gross, met each other on Sunday, June 5, 1934, at what was known as the War Creek Schoolhouse in Breathitt county. This school-

house was about 100 or 150 yards from a church in which there was at the time being held religious services. It is an undisputed fact that the deceased was at the time to some extent under the influence of intoxicants. About 11 o'clock of that day the deceased was in company with a number of other parties at or near the schoolhouse, seemingly engaged in an argument with a boy about obtaining from him something more to drink. While in that situation Charlie Overbee came from the church to where these parties were and stated, in substance, that he went down from the church house to the schoolhouse. When he got down there they were bunched up, 8 or 10 in the bunch. Marion Gross and a little boy had been in a racket, and Sherman Noble came walking up to where the crowd was, and he and Shelby Watkins had a few words, and then he and Marion Gross got into it. When Sherman Noble and Marion Gross got into it, Noble went backing off. There were a few words then passed between them which he did not understand. Noble backed something like 20 or 30 steps and they both came out with their guns. They got them out about the same time and both began firing about the same time. Noble fired once and Gross fired four times. Then Gross ran across the schoolhouse campus when Noble's Luger failed to shoot. It hung some way. He then handed it to James Morris, who is the person indicted jointly with Noble. James Morris gave him a .38 special. He then shot at Gross four or five times when Gross was running away from him. Gross then ran to the fence and through the fence around a big sycamore tree. He then came running back and Noble shot at him with his Luger, while Gross was running; when he did so Gross had his left hand or arm on his forehead and the other hand hanging down with a pistol in it, but he did no other shooting. Gross ran about 30 yards and then came running back towards Noble. It had been about two minutes. He was going in the direction of Noble with his left hand over his face and his pistol in his hand, hanging down; that he was running, stooped over; that when Noble shot him, he fell, and he went to him in about two or three minutes. He was still living. He further stated that he never shot or attempted to shoot after he began to run; that when the shooting first occurred each of them got their pistols about the same time; and that

when Noble's Luger hung, he then handed it to James Morris, and James Morris gave him a .38 special, and he shot that three or four times as the boy was running; that he saw Noble as he shot him, but he did not examine the wound. However, it was shown by Edgar Gross, another witness, who stated that when the trouble originated he was about 30 yards from where Marion Gross and the little boy were in an argument; that he saw Sherman Noble walk up to where the argument was going on, from the lower corner of the schoolhouse, and he came up at Marion Gross' back, and when he got within three or four feet of him, he stopped with his hand on his pistol. A boy in the crowd then turned to Noble and said something to him, but he did not understand what he said; that he and Marion Gross then got into an argument. They told each other to back, and each of them backed, and they then went to firing at each other, but he could not state, himself, which one shot first, but after Noble shot once his gun hung. He then began to shoot a .38 special. The deceased had already shot twice, but missed Noble, and he saw where the shots went to the left of his body and hit the dirt; then he saw Marion Gross shoot another time, when he heard Sherman Noble say to James Morris, "Give me my G—— d—— pistol." Morris gave him the pistol and Noble handed him the Luger; he then saw the deceased, who had run across the yard through the fence and heard him ask someone to give him a pistol. He then ran around a sycamore tree and back through the yard with his pistol in his hand, and his left hand up over his forehead and he was running in a whirl, and while he was running in that position toward Noble, Noble then shot him; that he must have shot as many as seven or eight times. He said it was about a minute and a half or two minutes after Gross stopped shooting and ran, when he was killed by Noble; that Gross did not shoot after he started to run, until the time he was killed. He further stated that from the time he started to run to the time he was killed, his pistol was just hanging down in his right hand. The other witnesses offered by the state practically corroborate the statements of the two witnesses referred to.

On the other hand, appellant states in substance that he knew Marion Gross; had never had any trouble

with him; that he saw several men at the schoolhouse huddled up together, but could not tell who they were except he remembered Jack Lawson, Charlie Overbee, Shelby Watkins, and Alex Combs; that he was walking through the schoolhouse lot in the direction of the church; as he passed the crowd one Shelby Watkins looked straight at him and said: "By G——, what have you got to say about this, Noble?" His answer was: "I haven't got a thing to say about it, I don't know anything about it." To which Watkins answered: "You look like you want to say something about it, you have a big frown on your face." He then started walking over toward him, and later Marion Gross came toward him. In fact, he stated that Marion Gross ran over to where he was with his pistol in his right hand; that he hit him with his hand and shoved him back and punched him with a pistol and said to him, "If you have anything to say about this, you say it to me." His answer was, "I haven't got a thing to say about it." He then said, "By G——, if you haven't got anything to say about it, get off the ground and go home," and he said in answer to that, "All right you give me a chance and I'll go home." He kept backing down through the schoolhouse yard asking the boys to let him go home. They followed him and he then backed down just below the schoolhouse, and Marion Gross, the deceased, started to shoot him; that he then pulled his pistol and for some reason or other it failed to fire; that the deceased shot three times at him and then ran ten or fifteen steps and fired again; that appellant got his pistol to working by that time, and that he fired about the same time that Gross fired his last shot; that he shot two or three times; that when Gross turned his back to him and ran off from him, he then started home, but Gross went up the path through the fence and down behind a sycamore tree where there were twelve or fifteen men. He said he could not see him any more; he was at the corner of the schoolhouse, out of view; he said when he looked again he saw Gross coming around the corner running toward him and he had a pistol in his hand and was "kinda" bent over; that he didn't hear him say a thing, and that he ran up in about eight or ten steps of him, when he shot him; that he shot him because he thought it was necessary to keep him from killing him.

This testimony of appellant was corroborated in

the main by a number of witnesses. However, there was one witness introduced by the Commonwealth, whose name was Eli Johnson. He stated that he saw the shooting; that when Marion Gross started to run, Noble fired three or four times at him as he ran, and that Gross ran through the fence, around a sycamore tree and back to the fence, and then came running in the direction of Noble; that as he ran he placed his left arm over his face with his pistol down in his hand; he did not see him any more, but did see the body and helped dress it. He heard eight or ten shots fired by Noble as Gross ran from the sycamore tree toward where Noble was; that the distance was some forty or fifty yards; that during the whole time that Gross was running he did no shooting, after the first shooting took place, which he did not see. When he dressed the body he found there was a wound in the head on the left-hand side, striking his head just about where the hatband would be, and extending through the head and making a wound in the back. The ball came out of the back of his head near the edge of the hair. The wound in his back was about an inch and a half or two inches long. He had on a cap when he was shot. The cap and clothing were all exhibited to the jury.

This in substance was the evidence presented by both plaintiff and defendants on the trial. It was conflicting, and the character of wound in his head indicated that when the deceased was shot he evidently was in an extremely stooped position because the ball could not have penetrated at the front of his head and passed through and come out at the lower part of the back of the head, and then cut the flesh on his back, had he been standing erect, or in any other position except with his head and body bent, very low. That was a fact that the jury could consider as to the shooting.

We have reached the conclusion that the evidence being conflicting, the verdict of the jury should not be disturbed. It is true that no one should be deprived of their life or liberty unless there is sufficient evidence to justify it. However, the jury were the sole judges of the facts and had a right to take into consideration the fact that appellant on this day, it being Sunday, armed himself with two deadly weapons and went to church, for in his testimony he admitted two pistols on his per-

son when he reached the place. While the jury cannot convict him for that alone, they had a perfect right to take into consideration all the facts and circumstances offered in evidence. It is hardly reasonable that any one not looking for trouble, if the opportunity afforded it, would go to church on the Holy Sabbath Day armed as this appellant was, as stated by several witnesses; that at the first opportunity he had, he drew the pistol, joined himself to a crowd where there was a controversy, or if he did not draw the pistol, placed his hand upon his hip pocket, indicating that he was ready and willing to use it, if the opportunity afforded itself. It appears further that the combat was mutual between himself and Marion Gross; that each backed from the other some 25 or 30 steps before they began to shoot, and when the shooting commenced, appellant was unable to use his Luger, obtained another, a .38 caliber, from his friend and codefendant and continued to shoot at Marion Gross as he ran; then stood ready when he saw Gross returning to carry out the mutual combat, if necessary, by shooting him when he was running in a whirl, with his left hand or arm over his eyes and stooped until his face nearly reached the ground, shooting him in a way and manner that the ball entered the head in front of the left side, coming out in the back of his head, which fact the jury no doubt considered in reaching their verdict, and believing it was not done in his necessary self defense or apparent necessity. The only verdict that the jury could have rendered was manslaughter; because neither malice nor bitter feeling was shown by the record, between the parties, we think the verdict of the jury was reasonable, and appellant has no legal right to complain.

The other question raised is of so little importance we will pass it. If the court permitted the witnesses referred to, to restate by rebuttal what they had already stated as substantive evidence, such an error, if it was one, would not and did not affect the substantial rights of appellant.

For these reasons, it is our opinion that the case should be affirmed.