# Williams v. Commonwealth.

Feb. 10, 1939.

A. F. BYRD and J. M. WOLFINBARGER for appellant.

HUBERT MEREDITH, Attorney General, and WM. F. NEILL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

Robert Williams was convicted in the Estill Circuit Court of the murder of Wilburn Horn, the verdict of the jury fixing his punishment at confinement in the penitentiary for life. From a judgment entered on that verdict he prosecutes this appeal, contending that the judgment should be reversed because of the following errors on the part of the trial court: (1) That the verdict is flagrantly against the evidence; (2) error in permitting incompetent evidence to be introduced and in rejecting competent evidence offered by him; (3) error in failing to give an instruction directing his acquittal by the jury in the event he acted in the justifiable defense of his son, Herman Williams; (4) error in overruling his objection to improper argument by the Commonwealth's attorney; (5) that the jury was not kept together as required by law; and (6) error in refusing to set aside the verdict and judgment and grant a new trial on the grounds of newly discovered evidence. We will consider these contentions in order.

(1) This ground for reversal urged by appellant requires a brief review of the evidence. This killing occurred shortly after noon on Sunday, April 10, 1938, at the store of Edward Harris on Barnes Mountain about five miles from Irvine. Appellant has three sons, Lewis, 27, Herman, 19, and Raymond, 16 years old respectively, who lived with him, were present at the time of this killing, and were indicted jointly with him. The defendant lived about one mile from the Harris store and deceased, Wilburn Horn, lived about half way between appellant's house and the store and on the road leading from appellant's home to the store.

On Friday before the killing, Raymond Williams

and another boy were in close proximity to the home of deceased and, for some reason or other, he did not like their actions and went out and ordered them to get away from the vicinity of his house. Deceased and Raymond Williams met next day at the house of a neighbor, John Thomas Hoover, and a conversation ensued between them concerning the action of the deceased in warning Raymond away from his place the preceding day. This conversation ended in a difficulty between deceased and Raymond, about the details of which the witnesses differ, George Horn, the son of decedent, giving one version and Raymond another. Deceased at that time drew his knife on Raymond and Raymond testifies that he "put it around his neck." They were parted without any damage being done. Raymond reported this difficulty to his father, Robert Williams, telling him that deceased had put a knife around his neck.

On Sunday morning about 9 o'clock, the Williamses went to the Harris store, passing the home of deceased on the way to the store. They met with George Horn, deceased's son, at the store and an argument ensued between appellant and George Horn with reference to the difficulty between deceased and Raymond the previous day. Appellant wanted to know from George Horn what they meant treating Raymond the way they did, hanging a knife around his neck. George says that he stated, in substance, that no man could draw enough of his boy's blood to stain a sheet and get by with it and live. Appellant says that he was merely asking for information in order to let the law settle it, but it is perfectly apparent from this conversation that appellant was feeling resentment over the treatment accorded Raymond by the deceased as reported to him by Raymond. George Horn went home and reported to deceased, Wilburn Horn, the conversation and argument with appellant. The Williamses left the store and went down the road some piece (they say to see about the branding of some ties they were making) and came back to the store shortly after noon and at that time were in company with Henry Gilbert and his son.

Shortly after eating dinner, the deceased, in company with Park McKinney, who ate dinner with him, left deceased's house and went to the Harris store and were seated in the store when the Williamses got back to the store the second time. One witness testifies that when the Williamses and Gilberts arrived at the store,

Henry Gilbert looked in the window, turned around and looked at the Williamses and then they all filed in. The killing took place very shortly after the entry of the Williamses into the store and of course there is great controversy as to exactly what occurred. The deceased, in a dying statement, testified to by three witnesses, and Park McKinney give almost the same version. According to them, after the entry of the Williamses into the store, Henry Gilbert asked deceased where his son, George, was and deceased replied that he was at home if somebody wanted to see him. Appellant projected himself into the controversy by saying, "I have a boy and he is here if anybody wants to see him," and deceased said, "Well, I am here, if anybody wants to see me he can see me." Immediately following these words Herman Williams pointed a pistol at deceased and snapped it, and, as the pistol snapped, deceased's hand went to his right side and Lewis Williams grabbed him and, as Lewis grabbed him, appellant shot deceased. The bullet entered deceased's back about two inches from the spine and came out on the right side of the abdomen.

Perhaps the most reliable version of the killing comes from Edward Harris, storekeeper, who details the conversation above mentioned just about as given by the deceased in his dying statement and by Park McKinney. After testifying to the preliminary conversation, he says, "Wilburn said 'I am here if anybody wants to see me,' and from that they went after their pistols and shot."

After the shooting, the Williamses were hustled out of the store. Witnesses for the Commonwealth state that in the yard at least two, or possibly three of the Williamses had pistols in their hands. Shortly thereafter, Wilburn Horn came out of the store. He and appellant had a conversation in the yard. Several Commonwealth witnesses say that deceased said, "Bob, you have shot me through and through," and that appellant replied in substance, "No man can hang a knife around my boy's neck and get by with it and live." Appellant and his sons say that his reply was, "Wilburn, you made me do it."

Appellant and his sons say that when the conversation in the store ensued, Wilburn Horn drew his pistol and that appellant then fired. Appellant's testimony

shows that deceased was a violent, dangerous man and that he had served two terms in the penitentiary, one for manslaughter and one on a second conviction for moonshining. Several witnesses testify for defendant that on the afternoon before the killing deceased was trying to borrow a pistol and made some threatening statements to the effect that he had had trouble with one of the Williams boys and would have killed him if he had had a pistol, and also said, "If I can get a gun I will kill every God damned Williams of the name."

It seems clear to us that the evidence justified the jury in arriving at the conclusion that appellant had formed a predetermination to kill the deceased. The brief recitation of the evidence given above shows that he was smoldering with resentment against deceased on account of the wrong he believed deceased had done Raymond by drawing the knife on him and, after the first words said at the store between Henry Gilbert and deceased, appellant evidently was seeking trouble by getting into the conversation between deceased and Gilbert. His remarks were made for the obvious purpose of arousing deceased at a time when he had his three boys present, he himself being armed and probably one or more of the boys being armed. Lewis was in a position to, and did, wrest deceased's pistol away from him before he had an opportunity to use it on appellant. Whether the version of the Commonwealth witnesses was accepted by the jury or whether they chose to accept the version of Mr. Harris, the jury was fully justified in arriving at the conclusion that this killing was a premeditated affair. We are of the opinion that the verdict of the jury was not flagrantly against the evidence, but that, on the contrary, the evidence fully and amply justified that verdict. For a verdict to be flagrantly against the evidence it must be without any substantial support in the evidence. Combs v. Commonwealth, 259 Ky. 703, 83 S. W. (2d) 46.

(2) Appellant complains that the court permitted details of the difficulty between deceased and Raymond Williams, appellant's son, which occurred the day before the killing. We think there is no merit in this contention. This difficulty, which was reported by appellant's son to him, was relied on by the Commonwealth to establish a motive for the killing. Appellant admits that his son reported to him that deceased drew a knife on him. The only other details of the difficulty per-

mitted consisted of some talk between the two and the testimony that Raymond had his hand on his hip pocket. Even if technically erroneous, such details were in no wise prejudicial to appellant. Appellant also complains because George Horn was permitted to testify to a quarrel or difficulty with him at the Harris store. This is also without merit because the statements of appellant in that conversation and argument were admissible as showing that he was harboring resentment towards deceased on account of the treatment of Raymond by him. Complaint is also made that the court erred in refusing to permit Arnold Harris, a witness for defendant, to answer the following question: "Were you close enough to him (Herman Williams) that if he had drawn a pistol there and snapped it at Wilburn you could have seen or heard it?" Plainly no error was committed in rejecting this question, as it called for an expression of opinion on the part of the witness. This witness had already stated the location and positions of the different parties and their distances from each other had been plainly established. The jury were as capable as this witness of judging whether or not he could have seen the pistol or heard the snap of it and it was their province to do so. These are the only matters complained of with reference to the rejection of evidence offered by appellant. It is clear that the court committed no error in any one of these particulars.

(3) Appellant relies largely on the case of Combs v. Commonwealth, 196 Ky. 804, 246 S. W. 132, in support of his contention that an instruction should have been given on the right of defendant to kill the deceased in defense of his sons, Herman, Raymond and Lewis Williams, or any one of them. We do not regard that case as authority here, largely because in that case the defendant denied shooting and because some evidence introduced in that case indicated that if he did shoot he might have been justified in doing so in defense of others who were with him. In the case at bar, appellant admits the shooting and assigns a specific and definite reason therefor, namely, that he believed his life was in danger. He and all of his sons flatly denied that any one of them was making or had made any demonstration of any kind towards the deceased. There is no evidence in this case that at the time appellant fired the fatal shot any one of his sons was in danger. It is true that there was evidence for the Commonwealth to the effect

that Herman Williams snapped a pistol at deceased, but all such evidence was to the effect that this was done at a time when deceased was seated and making no demonstration of any kind whatsoever towards anyone. As appellant himself assigned a specific reason, namely, his own self-defense, for firing the fatal shot and as there is no evidence in the case indicating any right upon his part to act in defense of any one of his sons, the court was justified in instructing only on self-defense. A ''defense of another'' instruction is not required unless the evidence justifies it or tends to show that the defendant fired in the defense of another. Caudill v. Commonwealth, 228 Ky. 722, 15 S. W. (2d) 435; Kindrick v. Commonwealth, 226 Ky. 144, 10 S. W. (2d) 639; Combs v. Commonwealth, supra. We are of the opinion that no error was committed in failing to give an instruction defining appellant's right to shoot in defense of another.

(4) Appellant contends that the trial court committed error in overruling his objection to argument of the Commonwealth's attorney in which he stated, in substance, that the sentencing of the defendant to the penitentiary would mean practically no punishment at all on account of the treatment which the prisoners receive, and that the only way to punish him effectively was to inflict the death penalty. As the defendant was not given the death penalty, it is perfectly obvious that such statement had no prejudicial effect on the jury. In any event, it is almost the identical language used in the case of Underwood v. Commonwealth, 266 Ky. 613, 99 S. W. (2d) 467, where it was held that such language was not prejudicial and reversible error, although the defendant received the death sentence. No error was committed by the trial court in this ruling.

(5) Appellant's contention that the trial court should have granted a new trial because the jury was not kept together as required by law is based on an affidavit stating that the jury was kept for three nights at a rooming house in two separate rooms with a door opening between the rooms, and that there was a door leading from each of said rooms into a hallway and doors leading from that hallway into another hallway that led to the outside of the building. There is no statement or intimation whatever that any person approached or attempted to approach the jury or had any conversation with the jury. Counter-affidavits of several jurors were filed by the Commonwealth, showing

that one of the doors opening into the hall was kept closed during the night and a bed made on the floor against the door in such manner that the door could not have been opened. Appellant's principal argument is that the door in the other room was only latched on the inside and that the sheriff slept near the door between the two rooms and that any juror or any other person could have opened the door without the knowledge of the sheriff. In our opinion, this does not even begin to be the character of evidence required to show that the jury was not properly kept together. It is common knowledge that in the ordinary county seat it is almost impossible to secure one room in which to keep the jury and that accommodations of this sort are the usual type afforded for the purpose. Minor v. Commonwealth, 5 Ky. Law Rep. 176, holds that the lodging of a jury at a hotel in different rooms along the same hall in which the sheriff locked them at night, there being no pretense that they were tampered with, was a sufficient compliance with this provision. We are of the opinion there is no merit whatever in this contention.

(6) Appellant, in support of his motion for a new trial on the grounds of newly discovered evidence, filed affidavits of four witnesses, the substance of which is that on the morning of the killing decedent made threatening statements about appellant and one of his boys. One of the affiants said that he made the statement, "I am the worst God damned son of a bitch that ever seen Barnes Mountain. I will kill Raymond Williams before dark or get killed." Another says that he stated he was going on home to get his dinner and might be dead before night and that he was going to the store. In another affidavit it is said that he told the affiant that he (the affiant) had always stood by him and that he wanted him (affiant) to go with him to Harris' store after they got their dinner. The fourth affidavit pertained to a threatening statement of similar import. The testimony offered here is of an impeaching nature designed to show ill-feeling on the part of deceased toward appellant and his sons. It is cumulative with other testimony of the same character introduced by the defendant. All the circumstances of the case as developed by the evidence indicate beyond question that there was ill will on the part of deceased towards appellant and we are of the opinion that this cumulative testimony is not of such a controlling character as would be reasonably

calculated to have a decisive influence on a retrial. A new trial should be granted on the ground of newly discovered evidence only where the evidence is of such decisive character as to render a different result reasonably certain. Sessmer v. Commonwealth, 273 Ky. 40, 115 S. W. (2d) 337; Waters v. Commonwealth, 276 Ky. 315, 124 S. W. (2d) 97, decided January 13, 1939. We are of the opinion that the newly discovered evidence relied on was far from being sufficient to require the trial court to grant a new trial.

As the record fails to disclose any error to the prejudice of the substantial rights of the appellant, it follows that the judgment must be and is hereby affirmed.