## Solomon v. Commonwealth.

April 21, 1939.

Joe L. Price, Judge.

ROY G. GARRISON and J. BRANDON PRICE for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Indictment was returned by the grand jury of Mc-Cracken County on January 12, 1938, charging that on said date appellant had committed a robbery by holding up and robbing one Elva Pace, the act being accomplished by the use of a deadly weapon. Kentucky Statutes, Sections 1159, 1159a.

He was brought to trial on January 19, 1938, and a jury returned a verdict of guilty, fixing punishment at life imprisonment. Motion for a new trial was sustained for reasons hereinafter shown.

On April 28, 1938, a second trial was had with the same result. Motion for new trial was overruled and from a judgment in accord with the verdict this appeal is prosecuted. The motion was supported by seven or eight grounds, but in the brief it is argued that the case should be reversed because:

(a) The verdict is contrary to the evidence.

(b) Of the court's refusal to grant a new trial, for the presentation of newly discovered evidence.

The chief prosecuting witness was Elva Pace, who at the time of the robbery was employed as serviceman at the filling station of the Martin Oil Company, located at the corner of 10th and Broadway in Paducah. At that time Solomon lived in an apartment house just across an alley between the apartment and the station. About 4 a. m. Pace had finished washing out the driveway, started into the office, and heard a noise. He says:

> "I pulled the door to, and backed out of the station and there was a barrel there where we kept our alcohol; it was sitting on horses, and I saw a man's feet. I could not get a clear view of his face and I walked out to where I could see his face and said: 'Jimmie what are you doing?'"

There was no reply and "he stepped out with his gun in his hand and said, 'stick 'em up.' I thought he was joking, and he called me by my name, 'Pace,' and asked whether I would rather give up the company's money or die, and I told him I would rather give up the money if I had to, and I tried to get him to take it out of my pocket, but he would not let me get that close to him. He marched me in the door, and we have a little

pan we kept the change in. I put it on the desk and he said he did not want that, he wanted bills. I said I did not have any, and he said 'yes you have, I have been watching you all night; get them out from those shelves.' I got out the cigar box and he said, 'you have to get that money out of the back room, I haven't time to hunt it.' When he reached for the cigar box I run out of the door and he took the change and all."

A check of the register showed a shortage of $20.

The person who dealt with Pace had on what witness called a "halloween mask, which covered the upper portion of his face." Pace said he knew Solomon well; had talked to him frequently, on the curb in front of his (Solomon's) home and at the station. He knew his voice; recognized him also by his feet and by his size, and said: "I have been around him enough to know it was him."

On cross-examination he said that he could see a part of Solomon's forehead; part of his nose, and all his mouth. Also on cross-examination, to make the case stronger, witness was required to give other conversation, and brought out the fact that he was pretty sure he had seen the gun before. He said: "He was shooting it Christmas night. I knew it; I was close enough to him, and it was close to my head." Lights were burning both outside and inside the station office.

A night watchman, who was stationed nearby the filling station, heard Pace yelling and at once went to the station. He saw a man running in the direction of Solomon's home. He said Pace was excited; came around the corner hollering, "Don't shoot me." Another officer answered a call and went to the station at once, made investigation and went from the office to the back door of the apartment house and found it open; it opened into a downstair's room in the rear. Another officer picked up $4, "laying on the sidewalk towards this house, from the filling station."

Horace Dudley said he had known appellant for four or five years; was with him the night of the robbery. He met him some time in the evening at his (Solomon's) home. They visited several places together, and went to appellant's home between 11 p. m. and 1 a. m., and went to bed. Later he heard a sound "like a chair knocked over," and Solomon told his mother to keep quiet. Witness had heard Solomon get

up and start to leave; his mother called to him and he told her he was going out. He did not see him come back. Soon after the chair was knocked over there was a commotion outside; flash lights around the house. Solomon was at home when witness arose at six or seven o'clock. "He said he had held up the filling station, but I did not believe him. I thought he was joking. He gave his mother some change." Witness saw a pistol and mask.

Solomon testified that on the night before the robbery he, with his mother and sister, visited the Vinson's, who lived eight or ten blocks from his home. They went there at 7 o'clock, and the mother and sister left about 10 or 11. Appellant remained with a friend who was ill, and did not leave until 6:30 a. m. He denied that he robbed Pace, or was around the gas station; said that he had never owned a mask, and had sold his gun prior to January 12, and that he was not with Dudley at any time during the night. He also denied each and every statement made by Dudley.

John Vinson testified that his son was suffering from an attack of tonsilitis on the night before the robbery. Mrs. Solomon, daughter and appellant came to the house that night about 6:30 p. m. He left home about 6:30 a. m., and Solomon was still there. Solomon was out of the house twice, once around twelve o'clock, and then about two o'clock to get a bucket of water. "I don't think he was out of the house around four o'clock." He had not sat up with his son at any other time. Mrs. Vinson, her son and Mrs. Solomon testified as did the father.

In rebuttal several witnesses contradicted the testimony of some of appellant's witnesses, but the contradiction related to immaterial matters.

We need take little time to comment upon the sufficiency of the evidence. The accused relied solely upon an alibi, and had the jury believed the testimony the case would have ended favorably to the appellant. "Alibi is not only a proper defense, but to an innocent man is always an essential defense, and indeed it may be his only defense; it affords, when established, the most perfect, physically conclusive evidence of his innocence." State v. Danelly, 107 S. E. 149. However, in a criminal case where the plea is that the defendant was not present at the scene of the crime, such evidence is

to be subjected to precisely the same test as any other evidence of a fact material to the question of guilt or innocence.

The argument of counsel is to the effect that the identification of accused by Pace was a "physical impossibility"; that Pace could not have identified accused, "because accused was masked, and the witness was excited at the time of the robbing." The witness admits his excitement, and there was just cause for it, but he unequivocally said that it was Solomon who robbed him. True he could not see all his face, but he recognized his feet; knew it was appellant from observing his size. The most convincing identification was appellant's voice. There is also other circumstantial evidence which would lend much weight to the evidence of Pace. Even though we might eliminate all condemnatory evidence save that of Pace's, particularly Dudley's, there was still sufficient evidence to take the case to the jury.

We are to determine only whether or not there is evidence enough to support the verdict. The jury judges the weight of the evidence, and this court may not invade that right or province of the jury, unless the verdict appears so flagrantly against the evidence as to shock the conscience. Noble v. Com., 267 Ky. 809, 103 S. W. (2d) 258; Falls v. Com., 268 Ky. 696, 105 S. W. (2d) 828.

A rather peculiar occurrence on the trial of this case relates to Horace Dudley's attitude. He testified for the commonwealth as to incriminating facts detailed above and on cross-examination he was asked whether or not he had signed an affidavit during the first trial, before the verdict was rendered against defendant, to the effect that he was the person who had robbed Pace, and in which he rather particularly described the hold up. He replied that he did not remember whether he did or not. In fact he said that about that time he was drunk or had taken some medicine and could not recall making the affidavit. He admitted signing it, but denied all knowledge of the circumstances and said positively he did not rob Pace.

It seems that on the first trial when this affidavit was filed, the proceedings stopped and there was held a court of inquiry in chambers, where the judge of the court examined Dudley and a transcript was made of his evidence, which was offered in evidence by the com-

monwealth; defendant objected to its introduction and the court sustained the objection but permitted it to go into the record in the nature of an avowal. This part of the transcript amplifies the affidavit, the witness going into minute detail as to the robbery. However, Dudley repudiated it in toto when he testified on the second trial.

The argument of counsel is to the effect that Dudley's previous confession cleared appellant of any guilt. We doubt very much whether the jury paid a great deal of attention to Dudley's testimony, or gave it much weight. However, eliminating his testimony, there was still sufficient evidence to uphold the verdict. We note that Pace, who knew Dudley well, was positive that he was not the person who held him up.

The complaint is made that the court erred prejudicially in not granting a new trial so as to permit introduction of what is termed "newly discovered evidence." In support of this motion appellant filed his affidavit in which he stated substantially as follows: That his brother Thomas Solomon saw Dudley rob Pace; that about a half hour before the robbery, at Mrs. Solomon's home, Dudley told him he was going to hold up the filling station at 10th and Broadway; that he thought Dudley was joking; that in an hour or hour and a half after making the statment, he left Mrs. Solomon's home, and witness later walked to a window in plain view of the station and saw Dudley go behind the station, put on a mask, come out to the front and hold up Pace.

The defendant and his attorneys did not know of affiant's knowledge of the holdup at the time of the trial, or they would have introduced him as a witness for defendant. They only learned of this evidence after the verdict, when appellant sent for one of his counsel to visit him in jail, and divulged the facts which he had just gotten from his brother, who had just then been put in jail.

Thomas Solomon files his affidavit in which he reiterates the statements made in the affidavit supra. He says that he did not tell his brother or his attorneys about the important evidence until about July 13th when he was put in jail where his brother was confined. It was alleged in appellant's affidavit that "said newly discovered evidence could not, with reasonable diligence, have been discovered and produced at the trial."

We have held time and again that a new trial should not be granted on the ground of newly discovered evidence, unless it is apparent that such alleged "after discovered" evidence is such as would likely produce a different result. Belcher v. Com., 247 Ky. 831, 57 S. W. (2d) 988. A court should not grant a new trial for the purpose of allowing newly discovered evidence, unless the evidence, in the opinion of the court, is of such persuasive character as would probably lead the jury to a different conclusion. Saylor v. Com., 235 Ky. 478, 31 S. W. (2d) 719; Williams v. Com., 276 Ky. 754, 125 S. W. (2d) 221. As bearing on this well established rule, there may be added numerous cases cited in Kentucky Digest, Vol. 6, entitled Criminal Law, 945(1).

The trial judge, when grounds are presented, must determine in the exercise of his good judgment whether or not the proffered evidence may or may not be such as would on its introduction be likely to effect a different result. From our analysis of the supporting affidavits we say without hesitancy that the court below did not err in his refusal to allow a new trial on this ground. The affidavit of the newly discovered witness speaks for itself.

The record before us shows that at 4 p. m. of the same day indictment was returned, appellant was arrested. On January 13, he was arraigned and on the 19th the first trial was had. If it be true that affiant, a brother of appellant, heard and saw what he related in his affidavit, it is unthinkable that he would remain silent and fail to tell what he knew until long after the term of court at which his brother was convicted the second time.

Again, had the brother testified on the trial as ne did in his affidavit, he would have flatly contradicted the mother who said positively that Dudley was not in the home on the night of the 12th. It does not so appear in the transcript, but when we read appellant's brief we find it said: "It was impossible to produce his brother Thomas Solomon at the trial because he was a deserter from the Army." It is not shown that witness was hiding out at all times between the night of the 12th and the day of the trial in April. It is not shown that it was impossible for communication during this period.

As we have viewed the record we find that Pace's evidence alone, without consideration of any other evi-

dence, circumstantial or otherwise, was sufficient to support the verdict. The evidence of appellant's witness to the effect that he was elsewhere at the time of the robbery might be convincing to us if sitting as a jury, but under our well established rules of law and procedure, this was solely a matter for the consideration of the jury. As far as our review of the record reveals, and we have read it carefully, more so because of the peculiar circumstances related, we find no prejudicial error.

Judgment affirmed.