## Satterfield v. Commonwealth.

Nov. 14, 1941.

J. Rivers Wright for appellant.

Hubert Meredith, Attorney General, and Wm. F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

Appellant, convicted for the murder of John Bell and sentenced to death, appeals from a judgment carrying into effect the verdict. While in motion for a new trial other grounds were advanced, on appeal several are waived, it being insisted that (a) The verdict is contrary to the law and evidence; (b) the court erroneously admitted incompetent evidence and rejected competent evidence, both over objections; (c) appellant's counsel was caught by surprise, due to the fact that one of defendant's witnesses testified to facts in a different way than same had been theretofore stated to counsel; (d) that accused had since the trial discovered new and important evidence, which could not have been reasonably discovered before or during trial. Lastly, the court failed to give the whole law of the case, and erred in giving an instruction on the law relative to the crime of murder.

While grounds (b) and (c) are set up in brief, we are not directed to any particular incompetent proof which counsel claims was erroneously admitted, or competent evidence rejected. However, since the point is raised, we have taken the trouble to examine carefully the transcript of evidence to ascertain whether such objections as are suggested are tenable. We find very few instances where objections were made to introduction or rejection, and in the very few instances the court properly ruled thereupon. Ground (c) is not discussed at length, and the record fails to show motion for continuance on the ground of surprise by reason of unfavorable testimony on the part of a witness who had theretofore made more favorable statements to counsel or appellant.

The accused and deceased were of the colored race; the homicide occurred in a portion of Louisville apparently frequented by members of that race, at about 6 p. m., on December 25, 1940. There is no question but that Bell died as a result of two wounds inflicted by a knife, one in or near the heart, entering from the front, clearly the fatal one, and another in the back, the point of entrance not being shown.

Bell lived in the immediate neighborhood of Pythian Hall across the street from Haley's Cafe at 10th and Chestnut Streets, near which point the homicide occurred. Accused lived in another part of the city, but at the time was engaged in playing in an orchestra in Pythian Hall, where dancing was in progress. The deceased lived next to the Hall with his father, mother and younger brother Paul, who played some part in an altercation just previous to the homicide. The latter had apparently been attending the dance at the Hall and left there about 5 p. m. He went across the street to the cafe and found his brother John there. He spoke to his brother and started to leave when appellant said, "You are a game s. o. b." Paul then went out the side door on Tenth Street and accused followed him and jumped on him. John appeared at this time and grabbed accused, and the three scuffled back into the cafe. Other persons in the cafe interposed and, according to witness, put Satterfield out of the building. Paul and the brother remained in the cafe a few moments, then went across the street to the home, where they sat by the fire for about fifteen minutes, when John said he would walk

across the street to see Clarence Maddox about going to a party. Witness says that just as soon as his brother stepped out "and the screen door slammed," John hollered "help." The father and mother rushed to the door, followed later by the brother. Witness saw John on a walkway by the side of the house, a few feet from the front door, and some one was running away. He says at no time during the evening did he or John have any sort of weapon.

It is shown in the proof that at some time shortly before the initial scuffle, Paul had been in the cafe and drinking a bottle of beer with Louise Johnson, who was admittedly the girl friend of Satterfield; it appears also that she went into Haley's with Paul. The mother and father corroborate the testimony of the son as to what occurred after the two boys came home, except they say that when they reached the point where deceased was attempting to get off the ground, Satterfield was there and stabbed at the father and then wheeled and ran. The father was certain he had a knife in his hand.

Frank Phelps, a railroad man more than 70 years of age, saw Paul and Louise Johnson come into Haley's and go to the counter, where they remained a few moments drinking beer. Satterfield came in as the two were leaving the bar, and said to the girl, "Get out of here you bitch," and as Paul got near the door Satterfield broke at him, and he, John and Paul went out the side door, and shortly all three "broke into the door," and some one pushed them out. He said that John and Paul came back into the cafe; witness went to the front door and saw Satterfield on the corner, and the girl across the street; they met and both went to the other side and Satterfield came back to the corner near Haley's, and some one told him not to go in, "don't have no trouble there aint nothin to it." Satterfield said, "I wont go in; John Bell lives across the street; the s. o. b. better move tonight; if I see him I am going to kill him." He also warned John and Paul not to go out, saying "Satterfield says he is going to kill you," and .John answered, "I am going to take the kid home." He says Satterfield had a knife "all the time" holding it behind him; the brothers had no weapons.

Another witness, detailing occurrences in the cafe, said that after the preliminary scuffle, in which deceased had gone to the relief of his younger brother, Satter-

field, still with a knife in his hand, when warned not to go into Haley's, said, "Well, I will go but if he stays over there I am going to get him tonight."

George Miller the man who separated the parties in the first scuffle, said John told Satterfield two or three times, "Don't hurt my brother." He also told of threats made to kill John. Cleo Richardson was the waitress in Haley's who served beer to Paul and Louise Johnson. She said that while they were drinking beer Satterfield walked in and said to her, "I told you about that damn negro," and Paul started out. She then relates the first disturbance, and that when bystanders pushed Satterfield out the door, following the scuffle, he said, "I will get you, you will have to move from Tenth and Chestnut." After some pressure witness said that Satterfield had a "brown handled knife"; the Bells had no weapons.

Other witnesses testify as to seeing Satterfield after the first difficulty, with a knife. It is unnecessary to detail further evidence for the commonwealth, which as not unusual in such cases, is not precisely in accord as to details.

Appellant admits that he struck the blow which caused the death of deceased, but asserts that he did so in order to protect himself. He admits that he had been a close friend of Louise Johnson for eight or ten months. He stated that during the afternoon of the homicide he had been playing for a dance in progress at the Hall. During an intermission Louise and some other girls asked him to go with them to the cafe. He started, but went back to the Hall to find out how long he could be absent, and was informed that the orchestra was about to resume playing. He went back to tell his friends he could not join them, but said to Louise, who was standing at the bar, "Get me a bottle of beer," then walked toward the victrola, "and they throwed me out." He says he was struck in the mouth and lost one tooth. He then met Louise on the corner and they went to the Pythian basement to wash the blood from his mouth. After this he determined that he would go to the Music Club, some distance away, for the purpose of having some one to take his place in the orchestra. In so doing he said he walked by the Bell home, when "this fellow jumped out on me, and hits me and I fell, and he stabbed at me with a knife. I grabbed his arm and we scuffled

for a while. The scuffle began at the gate and ended up in the yard. He had me down and I grabbed the wrist his knife was in and stabbed him, and dropped the knife and haven't seen it since." He said some one ran out the door and hollered "wait a minute until I get the gun and I'll kill him, and I got away from the boy and rushed up the street to the next corner."

He insists that he had no knife, but admitted that he kept away from his usual haunts because the matter was serious, and he was "going to wait until it was straightened out, and then come and give myself up." He denies the use of the threatening language attributed to him by the several witnesses.

Louise Johnson corroborates the testimony of accused, except that she says when they were "tussling in the side yard, Satterfield twisted John's arm and the knife fell out and he reached down to pick it up, and John fell on it." She said that Satterfield's tooth may have been knocked out at the time the bystanders were putting him out of Haley's.

Louis Archer and his wife were on their way home from 12th and Chestnut, "walking behind a girl and boy"; when they got near Pythian Hall they saw a boy jump out and strike, and they began a fight. They did not see either boy have a knife.

There was presented to the jury the question of whether accused was guilty of murder or of killing in sudden passion, or in self-defense. The evidence was conflicting, but there was more than ample proof to justify the conclusion on the part of the jury that the offense was premeditated murder. The real issue was whether or not appellant took the life of deceased in self-defense. It was incumbent upon him on this plea to convince the jury by his evidence that this was true. Evidently accused failed in this respect, and under the proof the verdict was justified. The jury had the sole right to measure and weigh the evidence to the extent of believing one class of witness and disbelieving the other, notwithstanding the sharp conflict.

There appears to be little merit in the contention that appellant on another trial might be afforded a different or more favorable verdict if the newly discovered evidence should be presented. While several affidavits

were filed in support of this ground (d), counsel for appellant impresses only two. Frank and Emma Satterfield, apparently mother and father of accused, in affidavit say that on February 13, 1941, while visiting with a neighbor and one James Murphy, detective, was present, all discussing the charge against accused, the detective said:

"If you had given up your child to me, I guarantee he would have come back to you. I would not have gotten a penny out of the case if I had arrested him."

We are totally unable to see wherein this testimony, if had on a new trial, would throw probative light on the question of guilt or innocence. It occurs to us that it would only have accentuated the proof of the commonwealth to the effect that accused was evading arrest after the homicide.

Halleck's affidavit is to the effect that on the night in question he was near 10th and Chestnut and saw a man he did not know grab Satterfield and pull him through a gate into the yard. The parties fell to the ground fighting, and while they were holding each other he saw a colored woman step back from where they were fighting. He said he was not present at the trial, and although he had known Satterfield for fifteen years, and was a school mate, he said nothing about his observations previous to the trial.

Edward Green filed his affidavit which was in effect the same at Halleck's except that he did not know either party. These affidavits were cumulative, since three other witnesses had testified to the same facts. Neither appellant nor counsel manifest in their affidavits any show of diligence in procuring this proof prior to the trial. It is merely stated that they had endeavored to procure all favorable testimony before the trial was begun. We fail to see wherein the newly discovered evidence, if produced on a new trial, would have had a decisive inffluence on the jury or in persuading a jury to reach a verdict other than the one returned. Williams v. Com., 276 Ky. 754, 125 S. W. (2d) 221, and cases cited.

Counsel contends that under all the facts and circumstances the court should not have instructed on the

law in respect to murder, but should have confined the instructions as to guilt of accused based on the law relating to voluntary manslaughter, since under the facts and circumstances shown the taking of Bell's life occurred in a sudden affray. We fail to see how the trial judge could have, as a matter of law, thus limited the gravity of the offense, or have omitted the giving of the usual murder instruction.

If appellant's version was true he was acting in self-defense. If the facts and circumstances developed by the prosecution were true there was not only motive but a strong inference that accused was lying in wait for Bell, with a weapon for the accomplishment of his purpose. The proof on many matters, some perhaps more or less material was conflicting, but it is essentially the province of the jury and not this court, to measure, weigh and reconcile, if possible, such conflicts.

We have given the entire record careful scrutiny, and so we fail to find anything complained of or otherwise which would justify us in concluding that the court did not afford appellant a fair and impartial trial, or that the verdict was not supported by the evidence.

Judgment affirmed.

The whole Court sitting.