RENDERED: FEBRUARY 20, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0433-DG

COMMONWEALTH OF KENTUCKY                                          APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.                              NO. 2021-CA-1349
LAUREL CIRCUIT COURT NO. 20-CR-00103


MELZENA LULABELL MOORE                                            APPELLEE


**OPINION OF THE COURT BY JUSTICE THOMPSON**

**<u>AFFIRMING IN PART, REVERSING IN PART, VACATING, AND REMANDING</u>**

Melzena Moore pled guilty to the first-degree manslaughter of Raymond Jackson under extreme emotional disturbance (EED) pursuant to a plea agreement. The sole issue on appeal is whether the Laurel Circuit Court erred in denying Moore the domestic violence exemption to the mandatory minimum sentence that must be served before violent offenders are eligible for parole.[1] Qualifying for this exemption would enable Moore to be considered for parole after serving 20% of her eighteen-year sentence; it would also qualify her for counseling and rehabilitation programs.

---

[1] This exemption is currently contained in Kentucky Revised Statutes (KRS) 439.3401(6), as renumbered from the version of KRS 439.3401 which was in effect when Moore committed her crime, which had the exemption contained in KRS 439.3401(5). Originally, when this provision was adopted, this language was contained in KRS 439.3401(4). For simplicity, we will reference the current numbering scheme, but will not correct direct quotes containing the prior subsection numbers.

The domestic violence exemption applies to the 85% mandatory minimum sentence that violent offenders must serve before becoming eligible for parole. It states:

> This section shall not apply to a person who has been determined by a court to have been a victim of domestic violence or abuse pursuant to KRS 533.060 *with regard to* the offenses involving the death of the victim or serious physical injury to the victim. The provisions of this subsection shall not extend to rape in the first degree or sodomy in the first degree by the defendant.

KRS 439.3401(6) (emphasis added).

The circuit court denied Moore this exemption, finding that she was a victim of domestic violence (based on a single incident for which she had corroborating testimony from a witness) but that her shooting of Jackson did not occur "with regard to" such domestic violence. We agree with the Court of Appeals that the trial court erred but disagree with the Court of Appeals' remand language.

We defined the standard for "with regard to" in *Commonwealth v. Vincent*, 70 S.W.3d 422, 424 (Ky. 2002), explaining it "dictates that there be *some connection or relationship* between the domestic violence suffered by the defendant and the underlying offense committed by the defendant." (Emphasis added). Similarly, in *Roberts v. Commonwealth*, 599 S.W.3d 841, 857 (Ky. 2020), we reiterated "[t]he trial court should look at the *totality of the evidence* to determine if *some connection* was shown." (Quoting *Holland v. Commonwealth*, 192 S.W.3d 433, 439 (Ky. App. 2005) (emphasis added).

2

Therefore, once the trial court determined that Moore was a victim of domestic violence, it was obligated to grant Moore the domestic violence exemption if it found, based on the totality of the evidence, there was "some connection" between the domestic violence she suffered and her killing of Jackson.

The trial court erred in its analysis that Moore's actions immediately prior to the shooting constituted "a strong indication to the Court that something other than domestic violence was involved in the offense." Such a conclusion demonstrates that the trial court failed to apply the relevant standard of "some connection" based on the totality of the evidence.

To determine what the totality of the evidence revealed, the trial court was obligated to make factual findings as to whether *all* the past incidents of domestic violence to which Moore testified, occurred or did not occur, after considering all relevant evidence, including the testimony from Moore's expert and Moore's plea to manslaughter EED. Only after the trial court made complete factual findings, and Moore's crime was put in context, could the trial court make a proper conclusion as to whether there was "some connection" between the domestic violence she suffered and the crime she committed.

We disagree with the Court of Appeals' remand language, that the trial court *must* grant the domestic violence exemption. The Court of Appeals cannot substitute its own factual findings for the trial court's missing factual findings to reach the result it concludes is justified by the evidence. This is not the role

3

of reviewing courts even when engaging in the *de novo* review of a mixed question of fact and law.

Accordingly, the appropriate remedy is to vacate the trial court's order so that the trial court can make thorough factual findings and then properly consider under the "some connection" standard whether Moore qualified for the domestic violence exemption. In doing so, the trial court may choose to review the record and issue a new order or may set the matter for another evidentiary hearing.

## I. FACTUAL AND LEGAL BACKGROUND

On May 23, 2020, Moore shot Jackson, killing him. On June 19, 2020, the grand jury indicted Moore for murder. As a result of a plea agreement, the Commonwealth amended Moore's charge to first-degree manslaughter EED and recommended she receive eighteen years' incarceration. Moore pled guilty and requested that the trial court apply the domestic violence exemption.

On October 11, 2021, the trial court conducted an evidentiary hearing on whether Moore qualified for the domestic violence exemption. Moore, Marvin Johnson, and Dr. Walter DeKeseredy testified for the defense and Brenda Horton and Lieutenant Chris Edwards testified for the Commonwealth.

Moore testified she became involved with Jackson in January 2017, and that for a year and a half the relationship was great. However, then Jackson began to become controlling and did not want to let her talk to other men. Moore described an incident where she was sitting in a chair, he punched her,

4

she fell over and the chair broke. She explained she had to "walk on eggshells" and Jackson frequently became mad at her.

Moore testified about an incident which occurred at Johnson's home where Jackson became angry at her, grabbed her by the hair and dragged her. When he let her go, she got up and hid behind furniture.

Moore described another incident in which she tried to leave, and Jackson broke her phone and threatened to kill her. Moore explained she was able to leave later when her mother arrived. Moore left all her possessions at Jackson's trailer, so that Jackson would not suspect she was leaving him; she told him they were going for food but never returned.

Moore testified she returned to Jackson because he told her it would be different and he loved her, but later she feared for her life. Moore testified that she was terrified of being buried alive and Jackson capitalized on her fear by threatening to bury her alive in a wooden casket (which he owned and kept in the closet of his trailer) if she did not obey him.

The defense introduced two photos of the casket into evidence, a picture looking down at the casket and another picture from the side of the casket. In the first picture, a person's pant leg is shown, which gives some sense of the scale of the casket. The second picture showed the words "Zeke rest here" written on the side of the casket.

Moore testified that Jackson had a drug problem and would use her to get drugs by making her have sex with his dealers in exchange for drugs, explaining this occurred multiple times and she did not want to do it. She

recounted he would become angry if she refused and would threaten to put her in the casket and nail it down. She testified that the words written on the casket, "Zeke rest here," was a reference to her because her nickname (for Melzena) was Zeke, and the writing was Jackson's writing. She testified the purpose of the casket was to keep her in fear.

Moore stated that if she continued to refuse, Jackson would "choke me out" and she would wake up finding herself tied to the bed and being raped. Moore admitted that after Jackson obtained the drugs by making her have sex to get them, they shared the drugs. Moore admitted they were both addicts.

Moore testified she endured abuse every day for two years, except when she would temporarily flee. She explained she never permanently left because she feared what Jackson would do if she did, and feared she would be kidnapped, gang raped, and buried alive in the casket underneath Jackson's trailer.

Regarding the incident which occurred the day before the shooting, Moore explained she was not with Jackson in his trailer that day, because she had left him again, but she returned after he called her and said he needed her. According to Moore, when she arrived there were a bunch of people at Jackson's trailer that night. Individuals present at some point in the night included Erika,[2] Justin Jackson and Savannah Baker. Moore explained that when she was alone in the bedroom with Jackson, he told her that he had

_____

[2] We refer to this woman by the pseudonym of "Erika" to protect her privacy due to the accusation that she was raped.

6

raped Erika the night before and was going to rape her again. According to Moore, he further told Moore "When I go in and holler at you, I want you to go in and slit her [Erika's] throat."

Moore testified that when Erika came back into the trailer, which was after all the other people had left, Jackson took Erika into the bedroom. He hollered at Moore, she came into the bedroom with a knife, and she found him raping Erika just as he had planned. Erika was screaming and there was no one to hear her besides Jackson and Moore.

Moore explained that when she went into the bedroom and saw Erika's face, she could not go through with Jackson's order to kill Erica. Moore stated she put the knife down and sat down on the bed. Moore explained she later had sex with Jackson, not because she wanted to do so, but to spare Erica.

Moore stated that Erika later told Moore that she wanted to leave, but did not know where she was, and that Moore could not help Erika leave until after Jackson fell asleep the next day. They left at around one to one thirty p.m. and went to meet Erika's friend at the Sunco because Erika wanted to go to the hospital.

Moore did not return to Jackson's right away. She walked to her cousin Frank Burman's home and got bullets from him, walked to her daughter's home to get a gun and a backpack, and walked back to Jackson's home with the loaded gun in her backpack.

Moore testified she wanted to scare Jackson with the gun. She stated that when she knocked on his door, Jackson immediately asked her where

7

Erika was and when Moore told him that Erika was at the hospital, Jackson punched her in the face, and she stumbled back out the door. Moore explained that Jackson was really mad and when he turned, she was afraid he was getting a knife. She grabbed her gun, but then Jackson grabbed the barrel. Moore recounted that she thought Jackson was going to take the gun and she was afraid for her life, so she shot him. Moore stated that later she threw the gun away off the side of the interstate.

Moore admitted she had never called 911 to report Jackson hurting her or attempted to get an emergency protective order (EPO) or a domestic violence order (DVO). She stated she never fought back and was scared to seek help, because Jackson broke her phone when she tried to call her mother for help. Moore was visibly teary when she explained she did not "know what he would have done if I'd of called the law." Moore also explained she did not think that EPOs/DVOs worked because "they break them anyway" and she was afraid of Jackson.

The Commonwealth challenged Moore's account of being unable to leave Jackson permanently when Jackson did not have a vehicle, did not drive, and therefore, had no way to realistically pursue her. The Commonwealth also challenged Moore's account that she did not have access to a vehicle to get away from Jackson because she had a traffic violation in 2019. Moore explained she did not have a vehicle but was able to occasionally borrow her mother's vehicle.

8

Johnson, an acquaintance of Jackson and Moore, testified Jackson and Moore attended a get-together that Johnson hosted at his house in 2019. Jackson was drinking. Johnson saw Jackson pull Moore through the hallway by her head of hair. Johnson said he told Jackson to leave and found Moore hiding in his utility room between his washer and his dryer.

The defense explained they wanted to call Erika but despite multiple attempts were unable to serve her and asked to have her statement to the police played instead. The record contains an unsuccessful subpoena which corroborates their inability to successfully serve Erika. The trial court denied this motion and Erika's statement was later presented by avowal.

Sociologist Dr. DeKeseredy testified via video link. He explained his very impressive credentials regarding studying violence against women over the course of thirty-six years, including writing twenty-seven books, 130 peer reviewed articles and contributing ninety scholarly book chapters. He explained he interviewed Moore for about an hour and administered a peer reviewed danger assessment to her, which was developed by an expert on femicide and is relied upon by those in his field to measure the risk of a victim of domestic violence being murdered by a partner or former partner. A blank copy of the danger assessment was admitted into evidence; it contains statements to which the person filling it out must answer yes or no.[3]

---

[3] The danger assessment contains questions such as:

Has the physical violence increased in severity or frequency over the past year? . . . Does he threaten to kill you? . . . Has he forced you to have sex when you do not wish to do so? . . . Does he ever try to choke/strangle

Dr. DeKeseredy explained that answers to the questions on the danger assessment result in a score used to measure the risk to the victim of domestic violence of being murdered by her partner. Dr. DeKeseredy testified that a score of 18 or above on the danger assessment indicates extreme danger, the highest category of risk available on the assessment. Moore scored a 31.

Dr. DeKeseredy concluded that Moore was clearly a victim of domestic violence and, based on her results, had a reasonable apprehension of death or serious bodily harm at Jackson's hands. Dr. DeKeseredy opined that based on Moore's account, the force she used to repel Jackson by shooting him was necessary and reasonable.

Dr. DeKeseredy explained it was common for victims of domestic violence to leave and return to their abusers multiple times and they often stayed or returned because they fear their abuser will kill them if they leave. He noted that Moore's report that Jackson threatened to kill her was a strong indicator of danger and stated that in the United States, victims of domestic violence have a six-fold increase in being murdered after they leave. He also explained that asking someone to kill another person is an act of domestic violence.

The following exchange took place during Dr. DeKeseredy's testimony:

Defense: In your opinion and based on your interview with Miss Moore and all of your experience, was domestic violence against Miss Moore intertwined with the commission of this act against Mr. Jackson?

DeKeseredy: Yes, it was.

_____

you or cut off your breathing? . . . Do you believe he is capable of killing you?

10

Defense: And was there a connection between Mr. Jackson's history of verbal and physical and mental abuse against Miss Moore and the commission of this act against Mr. Jackson?

DeKeseredy: Yes, and the number one risk . . . factor and well-known among leading experts in the field for intimate femicide is the history of male violence and he had such a history. And not only did he physically, sexually, and psychologically abuse Miss Moore over a two-year period, but it was brought to my attention that he raped his previous wife. Another major example of Mr. Jackson's violent history is him choking her until she passed out. He would allow drug dealers to rape her in exchange for drugs . . . she left him several times and he always threatened to kill her after she departed. And again I must emphasize that a woman's risk of being killed by an abusive partner increases six-fold after she leaves. . . .

Defense: Do you believe that Miss Moore was in danger of being killed on the night in question?

DeKeseredy: Yes, I do. Because of the history of domestic violence. There are some other risk factors. Obviously, the casket. He threatened to put her in it and nail it shut. Mr. Jackson . . . also has risk factors, such as possession of weapons, the throwing knives, stalking behavior, jealousy and possessiveness, heavy use of . . . alcohol and illicit drugs. He had male friends who abused women and . . . he was unemployed.

During cross-examination, Dr. DeKeseredy admitted the only information he considered was the information he received from Moore and defense counsel but indicated that he had no reason to believe that Moore was lying. He stated that Moore's failure to call the police was not uncommon, especially for sexual assault survivors, explaining that less than 2% of survivors call the police. He also indicated that based on his experience it would be extremely rare to find a survivor who experienced such extreme violence telling lies and he had no reason to believe that Moore was not telling the truth.

11

Brenda K. Horton, Jackson's sister, testified she served as a caretaker for Jackson and talked to him weekly. She denied ever seeing Jackson commit domestic violence.

Horton stated she was familiar with Jackson's casket and that it was a Halloween decoration. She explained the pictures made the casket seem bigger than it was and opined that neither she nor anyone in the courtroom could fit in it. Horton admitted that Jackson had mental problems, was schizophrenic, needed to take his medicine, and had some bad PSTD. Horton opined "he's an a**hole." She acknowledged that the police referred to a device on Jackson's property as a booby trap. Horton confirmed Jackson had threatened neighbors.

Detective Chris Edwards testified he located Moore eight to ten hours after the crime. He stated that at that time he did not observe any marks on her face as if she had been struck, and he would have noted that down in his report if he had observed it.

On November 8, 2021, the trial court denied Moore's motion to apply the domestic violence exemption in a detailed order. Based on Johnson's testimony, which the trial court explained corroborated Moore's testimony about a specific incident and was "compelling," the trial court found that Moore "has been a victim of domestic violence or abuse as defined in KRS 403.720."

The trial court ultimately determined "the Court does not find Moore's testimony to be credible concerning the shooting and the events leading up to the shooting. As such, the Court finds that Moore has not carried her burden of proof in this matter."

12

In support of this conclusion, the trial court explained its reasoning as follows:

> Whether or not [Moore] is a victim of domestic violence or abuse "with regard to" the offense she committed . . . is a far more difficult question [than whether she was a victim of domestic violence or abuse]. The only account of what actually happened on the night of the shooting comes from the testimony of Moore herself. She has presented no fact witness to corroborate her story, nor has she been able to produce or refer to any physical evidence that corroborates her story.
>
> As an initial matter the Court will note that prior to the shooting, Moore was not at [Jackson's] residence. Rather, she was at another location, out in the county, with other people. She did not have access to a vehicle that night, nor did [Jackson]. Nonetheless, Moore chose to walk back to [Jackson's] residence, stopping to get bullets for her gun along the way. This fact pattern is a strong indication to the Court that something other than domestic violence was involved in the offense.
>
> Moore testified that there was domestic violence immediately prior to the shooting. She says that [Jackson] hit her and then grabbed the barrel of the gun immediately before she fired the weapon. However, Detective Edwards testified that when he observed Moore after the shooting there were no visible signs of injury. This is in contrast to the facts in Crowe, wherein [Moore] told detectives that the victim had lunged at him, and bit him, prior to the murder. When the defendant in Crowe was interviewed he still had open wounds from the bite.
>
> Moore testified that there were three people in [Jackson's] residence when [Jackson] was raping [Erika], and when [Jackson] asked Moore to come out to slit [Erika's] throat, namely, Justin Jackson, [Erika] and Savannah Baker. However, no witness was presented at the hearing to corroborate Moore's version of what happened that night. This is in contrast to both Crowe and Roberts wherein ample corroborating evidence was presented to the trial court.
>
> Though [Moore] presented testimony of an expert on the issue of domestic violence, the expert was of little value in this case. Dr. De[K]eresedy only interviewed Moore as part of his assessment. He assumed her version of events to be true. Such a limited review is of little value to the Court.

13

(Paragraph numbering omitted).

Moore appealed on the basis that after the trial court concluded that Moore was a victim of domestic violence, it should have granted her the domestic violence exclusion. The trial court's denial of Moore's request to admit Erika's statement to the police as an unavailable witness was not raised as a ground for reversal in this appeal.

The Court of Appeals reversed and remanded. The Court of Appeals, noted that in resolving "whether domestic violence had a part in the actions of the victim who now stands accused of the crime, the court must determine if the offense occurred 'with regard to the offenses'" and that determination is reviewed "*de novo*, as . . . a mixed question of law and fact." *Moore v. Commonwealth*, No. 2021-CA-1349-MR, 2023 WL 4139883, at *2 (2023) (unpublished). The Court of Appeals determined that the "nexus," "connection" or "relationship" between the offense and the domestic violence suffered by the defendant that the trial court found to have occurred did not require a finding of "contemporaneous domestic violence in order to find that there was a connection between the shooting and the history of domestic violence." *Id.* at *4. The Court of Appeals summarized its holding as follows:

> [T]he trial court erred when, after finding that Moore was a victim of domestic violence, it did not find that the shooting of her abuser was 'with regard to' the abuse she had suffered. The court erred when it failed to give any credence to the expert testimony of a sociologist with over thirty-five years of study in violence against women. The court also erred in first accepting a plea to manslaughter in the first degree under an extreme emotional disturbance and then in finding that the shooting was not "with regard to" that same trigger, to wit, domestic violence. We reverse

14

with instructions to enter an order finding Moore is entitled to the exclusion in KRS 439.3401(5) for victims of domestic violence from the parole restrictions for violent offenders.

*Id.* at *7.

## II. ANALYSIS

The key issue we need to address in this appeal is whether the trial court could properly conclude that Moore was not entitled to the domestic violence exemption based on its findings and the application of the law to its findings. Of the multiple arguments the Commonwealth has raised as to why it believes the Court of Appeals should be reversed, the only substantive issue meriting detailed discussion is whether the Court of Appeals correctly interpreted its role regarding *de novo* review of a mixed question of law and fact, and thereby wrongfully substituted its judgment for that of the trial court.[4]

## A. The Domestic Violence Exemption from Violent Offender Parole and Sentencing Credit Restrictions

The domestic violence exemption is not a "get out of jail free" card. Instead, it recognizes that domestic violence victims who kill their abusers, when the killing has "some connection" to this past abuse, are less culpable than other criminals and should not be subject to the same restrictions on eligibility for parole as other violent offenders.

---

[4] The Commonwealth also argues that the Court of Appeals erred in: (1) disregarding the trial court's credibility determinations of Moore relating to the shooting; (2) mischaracterizing the trial court's evaluation of the expert witness's testimony and wrongfully requiring that such cases must have expert testimony; (3) disregarding the established test for determining whether the domestic violence exemption applied; and (4) incorrectly stating that the trial court made a legal holding about EED by accepting Moore's guilty plea. All of these other issues are generally addressed in our discussion about whether the trial court erred.

In 1991, the Kentucky Attorney General formed a Task Force on Domestic Violence Crime whose members included district judges, prosecutors, legislators, law-enforcement officers, and victim-service agencies.[5] The Task Force made dozens of recommendations on changes to Kentucky's domestic violence laws, such as making it easier to arrest those accused of committing domestic violence crimes; it also recommended that battered women who kill their abusers should be excluded from the violent felony offender provisions, which at that time required violent felons to serve half of their prison sentences before they were eligible for parole.[6]

In 1992, a number of bills were introduced into the General Assembly to implement the Task Force's recommendations, including House Bill (HB) 115, which made wide-sweeping amendments to Kentucky's domestic violence and abuse laws, and HB 256 which, among other things, amended the Violent Offender Act to add the "domestic violence exemption."

Representative Richard Lewis, a sponsor of HB 256, "said the bill would allow courts to deal more fairly with victims who shared a history of domestic with their abusers."[7]

HB 256 passed 93-0 in the House and 35-2 in the Senate and took effect on July 14, 1992. 1992 Kentucky Laws Ch. 173 (HB 256). HB 256 amended

---

[5] The Associated Press, *Domestic Violence Task Force is Formed*, The State Journal, Mar. 14, 1991, at A5.

[6] Mary O'Doherty, *Spouse-Abuse Task Force Calls for Changes in Law to Make Arrests Easier*, The Courier-Journal, Jun. 8, 1991, at 1, 5.

[7] Valarie Honeycutt & Chad Carlton, *House Oks Domestic Violence Bills: Laws Would Extend to Unmarried People*, Lexington Herald-Leader, Mar. 10, 1992, at A7.

KRS 503.010, KRS 503.050, and KRS 533.060 to add references to domestic violence which allowed more opportunities for justification and access to probation,[8] and added a new section to KRS 431.3401 (the violent offender statute).

This amendment to KRS 439.3401 excluded victims of domestic violence who qualified for the exemption from the "harsh parole requirement" that violent offenders had to serve 50% of their sentences before they became eligible for parole. *Gober v. Commonwealth*, 79 S.W.3d 887, 888 (Ky. App. 2002).

HB 256 also enacted KRS 439.3402 which acted as a "supplement" to the amendment to KRS 439.3401. *Gober*, 79 S.W.3d at 888.

> Under KRS 439.3402, *any person* adjudicated a violent offender under KRS 439.3401 before July 14, 1992 may petition the circuit court for reconsideration of that status. The circuit court is then empowered to determine whether such offender is a victim of domestic violence, and, thus, exempt from the parole requirements of KRS 439.3401.

---

[8] The amendment to KRS 503.010 added a definition for "imminent" as meaning "impending danger, and, in the context of domestic violence and abuse as defined by KRS 403.720, belief that danger is imminent can be inferred from a past pattern of repeated serious abuse." KRS 503.010(3). This then allowed the use of force to be justifiable pursuant to KRS 503.050(1), "when the defendant believes that such force is necessary to protect himself against the use or *imminent* use of unlawful physical force by another person" and KRS 503.050(3) specifically allowed evidence to establish prior acts of domestic violence to be admissible. (Emphasis added). KRS 533.060, which previously established a rule that someone who is convicted of shooting another person is ineligible for probation, shock probation, and conditional discharge, was amended to add an exception for victims of domestic violence who used such a weapon against a prior perpetrator of domestic violence.

*Id.* at 889. This is evidence of the significant change that the General Assembly wished to make in how victims of domestic violence who kill their abusers are treated.

The domestic violence exemption has not been amended since its passage, even though in 1998, KRS 439.3401 was amended to increase the mandatory minimum sentence that other violent offenders must serve to 85% and also limited their ability to earn credits, which could not decrease this mandatory minimum. 1998 Kentucky Laws Ch. 606 (H.B. 455) § 77(3)-(4).

The domestic violence exemption states in relevant part that the violent offender provisions "shall not apply to a person who has been determined by a court to have been a victim of domestic violence or abuse pursuant to KRS 533.060 with regard to the offenses involving the death of the victim or serious physical injury to the victim." KRS 439.3401(6).

KRS 439.3401(6) incorporates KRS 533.060, which provides in relevant part that a person is a victim of domestic violence or abuse if "the person against whom [the defendant's] weapon was used *had previously* or was then engaged in an act or acts of domestic violence and abuse as defined in KRS 403.720 against either the person convicted or a family member as defined in KRS 403.720 of the person convicted." (Emphasis added). KRS 403.720(2)(a) in turn defines "domestic violence and abuse" as: "Physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse,

18

strangulation, or assault between family members or members of an unmarried couple[.]"

The KRS 439.3401(6) exemption "provide[s] leniency for the domestic violence victim who strikes back at an abuser[.]" *Shelton v. Commonwealth*, 992 S.W.2d 849, 851 (Ky. App. 1998). Without the exemption, violent offenders are now required to serve 85% of their sentences before becoming eligible for parole and are limited in their ability to earn credit on their sentences. KRS 439.3401(1), (4)-(5).[9]

To ascertain whether a defendant qualifies for the domestic violence exemption, a two-part test is applied. "[T]o qualify for the [domestic violence] exemption, the violent offender must have been (1) a victim of domestic violence or abuse and (2) that violence or abuse must have also occurred 'with regard to' the crime committed by the violent offender claiming the exemption." *Gaines v. Commonwealth*, 439 S.W.3d 160, 164 (Ky. 2014). We focus on the second prong of this test as there is no dispute that the trial court properly found that Moore was a victim of domestic violence.

In determining whether a defendant was a "victim of domestic violence or abuse . . . with regard to the offenses involving the death of the victim[,]" KRS 439.3401(6), we have interpreted the phrase "with regard to the offenses" in a variety of ways that we consider synonymous. A defendant properly qualifies for the domestic violence exemption if that defendant can establish that there

---

[9] The wording regarding what credit may be earned in KRS 439.3401(5), changed with 2024 Kentucky Laws Ch. 174 § 32 (HB 5).

is "some connection," "involvement," or "some relationship" between the domestic violence and the offense the defendant committed.[10] *This does not require "a direct and immediate causal connection between the act of domestic violence and the murder[.]" Gaines*, 439 S.W.3d at 165 (emphasis added). "[T]he defendant need not have committed the crime **because of** the domestic violence nor must the crime be **the result of** the domestic violence[.]" *Crowe*, 610 S.W.3d at 226 (emphasis in original). There is no requirement that the domestic violence or abuse must have occurred contemporaneously with the offense for which the defendant was charged; the only requirement is that "the evidence connect the crime and the abuse." *Holland*, 192 S.W.3d at 438. We have never indicated that there is some definitive proximity in time between act(s) of domestic violence against the defendant and the defendant's crime which must be satisfied to find an appropriate connection between the two, thus qualifying the defendant for the domestic violence exemption.

Additionally, the involvement of domestic violence in the later commission of the crime does not require that the domestic violence is the sole reason for the defendant's action or happened right before the killing, but it must comprise "some connection" with the defendant's action. The "some connection" standard is a low bar that can be satisfied even if there were other

---

[10] *Commonwealth v. Crowe*, 610 S.W.3d 218, 226 (Ky. 2020) ("involved" "relationship" "connection"); *Roberts*, 599 S.W.3d at 857 (quoting *Holland*, 192 S.W.3d at 439) ("some connection"); *Gaines*, 439 S.W.3d at 165 ("involved");*Vincent*, 70 S.W.3d at 424 ("some connection or relationship").

motivations involved in the killing and the timing of the killing is attenuated from the last act of domestic violence.

While a diagnosis of PTSD caused by domestic violence could be sufficient to make a connection between a defendant's actions and past abuse, a formal diagnosis of PTSD is not necessary to qualify for the exemption. Although testimony from an expert connecting the intimate partner violence to symptoms the defendant suffers is highly relevant to finding a connection between the crime and the domestic violence, such testimony is not required.

We clarified in *Crowe*, 610 S.W.3d at 224-25, how the standard of review applied to the second part of the test: "[W]hether the domestic violence or abuse endured by the defendant occurred 'with regard to the offenses' committed by that defendant, is a mixed question of law and fact. As such, the trial court's determinations . . . are reviewed de novo." To resolve this issue, it is necessary for the trial court to make factual findings regarding *all* incidents of domestic violence for which evidence is introduced as such findings are needed to determine what the totality of the evidence reveals about whether there is "some connection" between the domestic violence suffered and the commission of the crime.

In *Crowe* and *Holland*, the trial courts made sufficient factual findings for the appellate courts to consider whether the trial courts had correctly applied the law to their findings in reaching their ultimate conclusion as to whether the exemption applied. In *Crowe* while there were other possible or other overlapping motives for the killing, the trial court's factual findings were

21

sufficient to establish that domestic violence was involved in the commission of the crime. 610 S.W.3d at 226-27. In *Holland*, 192 S.W.3d at 438–39, the Court of Appeals correctly explained that the fact that the person who had a history of inflicting domestic violence against the defendant was seated and apparently not a threat to her when she shot him, and self-defense was thereby not applicable, did not foreclose that it could still be appropriate to apply the exemption.

## B. General Considerations Regarding Domestic Violence

Our nation, and Kentucky specifically, has to some extent failed victims of domestic violence/intimate partner violence. As Kentucky's Attorney General Russell Coleman noted in a report his office released just this year, Kentucky has one of the highest rates of intimate partner violence in the country and it is among the top ten states for men murdering women.[11]

There are several types of intimate partner violence as explained on the Kentucky United Against Violence (ZeroV) and National Domestic Violence Hotline (NDVH) websites.[12] Among them are physical abuse, sexual abuse, and emotional abuse. These types of abuse constitute "relationship abuse" which

---

[11] Office of the Kentucky Attorney General, *Responding to Strangulation in Kentucky: Guidelines for Prosecutors, Law Enforcement, Health Care Providers, and Victim Advocates* 5 (2025), https://www.ag.ky.gov/Press%20Release%20Attachments /Responding%20to%20Strangulation%20in%20Kentucky%201.15.25.pdf.

[12] We located these websites via the Cabinet for Health and Family Services (CHFS) website, which provided resources for domestic violence. CHFS specifically linked to the ZeroV website, and the ZeroV website linked to the NDVH website. In *Roberts v. Commonwealth*, 599 S.W.3d 841, 857-58 (Ky. 2020), our opinion specifically determined it was appropriate to cite domestic violence resources we located via the CHFS website.

"is a pattern of behaviors used to gain or maintain power and control over a partner[.]"[13]

> Physical abuse is a pattern of physical violence that leads to physical harm. It includes behaviors such as hitting, punching, kicking, shoving, slapping, strangling, smothering, using or threatening to use weapons, interrupting sleep, throwing things, destroying property, hurting or killing pets, and denying medical treatment.[14]

Physical abuse can include "pull[ing] your hair or punch[ing], slap[ping], kick[ing], bit[ing], chok[ing] or smother[ing] you[.]"[15] Moore testified that Jackson hit, punched, and strangled her, pulled her hair, kicked over the chair she was sitting in, and broke her phone.

"Sexual abuse is a pattern of unwanted sexual activity" and "includes physically forcing sex, making someone feel afraid to refuse sex, [and] forcing sex with other partners."[16] Sexual abuse can include "[f]orc[ing] or manipulat[ing] you into having sex or performing sexual acts," "[s]trangl[ing] you or restrain[ing] you during sex without your consent" and "[i]nvolving other people in your sexual activities against your will."[17] Moore testified that Jackson forced her to engage in unwanted sex by threatening her with being buried alive if she refused to have sex with Jackson's drug dealers and when

---

[13] *Types of Abuse*, National Domestic Violence Hotline, https://www.thehotline .org/resources/types-of-abuse/ (last visited Jan. 16, 2025).

[14] *About Abuse*, Kentucky United Against Violence, https://www.zerov.org/ about_abuse (last visited Jan. 16, 2025).

[15] *Types of Abuse*, *supra* note 13.

[16] *About Abuse*, *supra* note 14.

[17] *Types of Abuse*, *supra* note 13.

she did refuse, Jackson choked her until she passed out and she awoke to finding herself tied up and being raped by Jackson's drug dealers.

It is well established that the infliction of domestic violence has serious and broad mental health consequences for victims, including increasing the victim's risk for developing post-traumatic stress disorder (PTSD).[18] In fact, the majority of women who are subjected to intimate partner violence develop PTSD.[19]

"PTSD is a normal reaction to abnormal events."[20] PTSD is categorized as a mental disorder pursuant to the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013) (DSM-5). PTSD requires "[e]xposure to actual or threatened death, serious injury, or sexual violence" including "[d]irectly experiencing the traumatic event(s)" and "[w]itnessing, in person, the event(s) as it occurred to others."[21] It is important

---

[18] *Information Memorandum: The Intersection of Domestic Violence, Mental Health, and Substance Use*, Department of Health and Human Services, 3 (2019).

[19] *See* Carole Warshaw & Gabriela A. Zapata-Alma, *Mental Health Treatment in the Context of Intimate Partner Violence*, National Center on Domestic Violence, Trauma & Mental Health, 5 (2021) (study estimates of 45-84%, weighted mean prevalence across studies 61%); Alison M. Nathanson et. al., *The Prevalence of Mental Health Disorders in a Community Sample of Female Victims of Intimate Partner Violence*, Partner Abuse, 2 (January 2012) (study estimates 51-75%, self-reported 55-92%); Njeri Mathis Rutledge, *Turning A Blind Eye: Perjury in Domestic Violence Cases*, 39 N.M.L. Rev. 149, 169 (2009) (study estimate 63%).

[20] Loring Jones et al., *Post-Traumatic Stress Disorder (PTSD) in Victims of Domestic Violence: A Review of the Research*, Trauma, Violence, & Abuse 110 (April 2001).

[21] DSM-5 Diagnostic Criteria for PTSD.

to recognize that the previously separate category of battered women's syndrome is now recognized as being a subset of PTSD.[22]

"The extent, severity, and type of abuse is associated with the intensity of PTSD. . . . Sexual abuse, severe physical abuse, and psychological abuse are associated with an increase in trauma symptoms among victims."[23] "[T]he more severe the violence towards the victim, the more severe the PTSD symptoms are the more likely that their symptoms will garner a diagnosis of PTSD."[24]

"In the majority of cases, survivors [of domestic violence] who kill their partners have been severely abused for long periods of time, feel that they are in imminent danger, and believe they have no other choice to prevent the murder or serious injury of themselves or their children."[25]

> "It was either him or me." That is how many women explain why they resorted to killing their abusive intimate partners. In the majority of cases, survivors who are charged with murder or manslaughter for killing their intimate partners do not deny having committed the act. Rather, they often claim that the act was committed in self-defense.[26]

---

[22] Amin R. Yacoub & Becky Briggs, *The Future of Criminal Culpability: Posttraumatic Stress Disorder's ("Ptsd") Effect on A Defendant's Actions and State of Mind*, 56 U.S.F.L. Rev. 425, 428 (2022); Betsy J. Grey, *Neuroscience, Ptsd, and Sentencing Mitigation*, 34 Cardozo L. Rev. 53, 73–74 (2012).

[23] Jones, *supra* note 20, at 111.

[24] Nathanson, *supra* note 19, at 2.

[25] Warshaw, *supra* note 19, at 15.

[26] Inès Zamouri, *Self-Defense, Responsibility, and Punishment: Rethinking the Criminalization of Women Who Kill Their Abusive Intimate Partners*, 30 UCLA J. Gender & L. 203, 211–12 (2023) (citation footnotes omitted). *See* Kit Kinports, *Defending Battered Women's Self-Defense Claims*, 67 Or. L. Rev. 393, 424–26 (1988) (arguing that women who kill their abuser when they are able to do so, knowing future violence awaits them, face an imminent threat and should be considered to be acting in self-defense).

Moore's account of killing Jackson fits within this common narrative of admitting she killed him because she feared he would kill her and claiming she acted in self-defense.

This perception by victims of the risk they face may be accurate, even if such a crime does not constitute self-defense. Data from U.S. crime reports reveals that "over half of female homicide victims are killed by a current or former male intimate partner."[27] These figures are consistent with Dr. DeKeresedy's testimony about the risk survivors face when they try to leave their abusers.

If the victim has suffered from previous strangulations from her abuser, her risk of being killed is significant:

> Strangulation is one of the most accurate predictors for the subsequent homicide of victims of domestic violence. Strangulation is the calling card of a serial rapist. The problem of intimate partner violence (IPV) is multifaceted, but experts agree there are few offenses as indicative of an intent to control, harm, and/or kill than strangulation. In fact, if a person is strangled even one time, the victim's chance of being killed by their abuser is increased by 750%.[28]

Moore testified about repeatedly being strangled by Jackson to the point of losing consciousness which gives credence to her fear that Jackson would kill her.

---

[27] *Intimate Partner Violence Prevention,* the Centers for Disease Control, (May 16, 2024), https://www.cdc.gov/intimate-partner violence/about/?CDC_AAref_Val= https://www.cdc.gov/violenceprevention/intimatepartnerviolence/fastfact.html.

[28] Office of the Kentucky Attorney General, *supra* note 11, at 5.

Given the significant harms caused to victims of domestic violence by their abusers, it is difficult for factfinders to understand how a woman victim would let abuse continue to happen to her and "many continue to perceive a woman's decision to stay as externally inconsistent."[29] The idea that victims can simply leave is naïve.[30] Part of the reason victims simply feel that they cannot leave is because they are stuck in a relationship

> characterized by coercive control, a pattern of domination that includes tactics to isolate, degrade, exploit and control the survivor. . . . Once a perpetrator of abuse has appropriated the power to verbally restrict his partner's day-to-day choices, physical violence then serves as both the abuser's means of enforcing that control and the punishment for attempting to resist it.[31]

The very trauma the victim has suffered, which in turn causes "mental health problems, including PTSD, depression, and substance abuse/dependence, may increase the chances that women will remain with their abusive partners and, in turn, increase risk for re-abuse."[32]

Additionally, victims feel helpless and do not believe that law enforcement and the court system will protect them.[33] Abusers communicate a message that their victims lack all control over their own safety through

---

[29] Deborah Epstein & Lisa A. Goodman, *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences*, 167 U. Ps. L. Rev. 399, 414 (2019).

[30] Jessie Bode Brown, *The Costs of Domestic Violence in the Employment Arena: A Call for Legal Reform and Community-Based Education Initiatives*, 16 Va. J. Soc. Pol'y & L. 1, 14 (2008).

[31] Epstein, *supra* note 29, at 413-14.

[32] Nathanson, *supra* note 19, at 1.

[33] Yacoub, *supra* note 22, at 432-33.

various means, including the infliction of non-fatal strangulation. "[Domestic violence offenders] strangle to send a message that they can kill [their victims], any time they wish. Once a victim believes this to be true, they live under the power and control of their perpetrator daily."[34]

Moore testified she did not believe she could get help from the police or the court system because the mere act of getting an EPO/DVO would not protect her. Moore's testimony about being repeatedly strangled as a punishment for not obeying Jackson's demands, is consistent with her assertion that she believed she could not safely leave Jackson even if she sought help. DeKeresedy also testified that victims generally do not report their abuse or seek such help.

"Right or wrong '[j]udges and jurors expect more corroboration of physical injuries in domestic violence cases than in other serious crimes[.]'"[35] Of course, "[t]he value of corroborative evidence in domestic violence cases cannot be overstated."[36] While corroboration can be very helpful for factfinders, the reality is that it is rare to have corroborating evidence of domestic violence because domestic violence usually occurs inside the home and only the victim and the abuser know what happened.[37]

---

[34] Office of the Kentucky Attorney General, *supra* note 11, at 8.

[35] Naomi R. Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions*, 44 Vand. L. Rev. 1041, 1097 n.225 (1991) (quoting *Massachusetts Gender Bias Study Committee, Gender Bias Study for the Supreme Judicial Court* 62, 81 (1989)).

[36] *Burden of Proof,* Domestic Violence Practice and Procedure § 2:76.

[37] Cahn, *supra* note 35, at 1082.

Demanding corroboration to find a victim of domestic violence credible is essentially the trial court favoring its idea of a "fictional 'perfect' victim [of domestic violence] who promptly and consistently reports abuse to police, doctors, and family members" even though survivors often come from communities who distrust the authorities and their lived experience differs substantially from the ideal of how they should behave if they are in fact victims of abuse.[38]

This information is important to consider because it places our violent offender exemption for victims of domestic violence in context and furthers our understanding of the intent behind our General Assembly's decision to enact the domestic violence exemption.

## C. The Trial Court Failed to Make Sufficient Factual Findings, Due to Its Misunderstanding of the "Some Connection" Standard.

In concluding that Moore was a victim of domestic violence, the trial court only made findings regarding one specific incident observed by Johnson and testified to by both Moore and Johnson, when Jackson pulled Moore by the hair. In concluding this physical abuse constituted domestic violence, the trial court necessarily found that Moore and Jackson qualified as members of an unmarried couple because they were either living together or had formally lived together. KRS 403.720(6).

However, the trial court neglected to make *any* finding as to whether the myriad other incidents of domestic violence and abuse to which Moore testified occurred or did not occur. It appears that the trial court failed to make any such findings based on a misinterpretation of the law, that such incidents of

---

[38] Elizabeth Langston Isaacs, *The Mythology of the Three Liars and the Criminalization of Survival*, 42 Yale L. & Pol'y Rev. 427, 504-05 (2024).

domestic violence had to directly cause her crime, either by happening in conjunction with the shooting or shortly before it, for her crime to be "as a result of" domestic violence.

The trial court, in resolving whether Moore was a victim of domestic violence or abuse with regard to shooting Jackson, only considered and discussed Moore's account of the events that took place on the night of the shooting (rather than giving any consideration to any prior history of domestic violence), faulted Moore for not producing corroborating evidence (despite the fact that there arguably was none), and determined that her decision to leave a location where she was away from Jackson and to come back to Jackson's trailer with a gun, "is a strong indication to the Court that something other than domestic violence was involved in the case."

This is a clear misinterpretation of the relevant standard. The law does not require a causal, contemporaneous act of domestic violence. It also does not require that the defendant's only motivation for killing her abuser be the domestic violence. Instead, the defendant must only establish, by a preponderance of the evidence, "some connection" between the act and the domestic violence.

Therefore, even if there was "something other than domestic violence" involved in Moore's decision to shoot Jackson, that does not preclude a ruling that there could still be "some connection" between the shooting and domestic violence. In resolving this issue, the trial court should have considered the totality of the evidence, which includes the fact that Moore pled to first-degree

30

manslaughter of Jackson under EED.[39] As explained in KRS 507.020(1)(a), an exception to murder which reduces the crime to manslaughter, is the situation where the defendant "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be."

If the reasonable explanation for the EED was not the rape of Erika and being told to kill her, the fear that Jackson's anger over Erika going to the hospital would result in Jackson killing or seriously injuring Moore, or that the general history of domestic violence caused Moore to fear Jackson's potential reaction to her presence and attempt to stand up to him, it is difficult to imagine what the source of the EED would be. While we recognize that plea agreements will not necessarily perfectly conform to what the Commonwealth believes has occurred, they should have some basis in the Commonwealth's calculus regarding what could reasonably be proven. Therefore, while Moore's plea to first-degree manslaughter under EED is not definitive as to whether she qualified for the exemption, it is certainly relevant to the trial court's evaluation

---

[39] KRS 507.030(1) provides:

(1) A person is guilty of manslaughter in the first degree when:
. . .
  (b) With intent to cause the death of another person, he or she causes the death of such person or of a third person under circumstances which do not constitute murder because he or she acts under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020[.]

and part of the totality of the circumstances. We also observe that the Commonwealth in its presentation of evidence and cross-examination of Moore failed to provide any alternative motive for her shooting of Jackson, and failed to provide any alternative theory of what else could have prompted Moore's EED.

The trial court should have considered all evidence about the total course of Moore's relationship with Jackson and the series of very disturbing domestic violence incidents which she testified occurred. The importance of such findings regarding the prior incidents of domestic violence and abuse cannot be understated when it comes to resolving whether the exemption was established. Appellate courts cannot properly review a decision which is not supported by sufficient factual findings. *See generally Molyneaux v. City of Bardstown,* 656 S.W.3d 232, 246-47 (Ky. App. 2022); *Nebraska All. Realty Company v. Brewer,* 529 S.W.3d 307, 314-15 (Ky. App. 2017); *Mattingly v. Fidanza,* 411 S.W.3d 250, 255 (Ky. App. 2013).

Based on Moore's testimony, the trial court could have found that besides the incident observed by Johnson, Jackson's conduct repeatedly constituted domestic violence as defined in KRS 403.720(2)(a). Moore's testimony about how Jackson harmed her fit into the categories of "[p]hysical injury, serious physical injury, . . . sexual abuse, strangulation, [and] assault[.]" *Id. See* KRS 403.720(8) (defining sexual assault); KRS 403.720(9) (defining strangulation). Moore testified about being hit, strangled, and forced to engage in sex with other individuals, explaining if she did not comply

32

Jackson would choke her until she passed out, and recounted she would wake up to find out that she was tied up and being raped.

Moore's testimony also covered conduct which qualified as "infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault[.]" KRS 403.720(2)(a). She testified as to Jackson's repeated threats, including that if she did not voluntarily have sex with drug dealers that she would be raped instead, his threats to kill her, and to bury her alive in the casket. When Moore refused to sleep with Jackson's drug dealers, Jackson would choke her until she passed out, and she would awaken while being raped.

As *the threat itself is the domestic violence*, regardless of whether it can literally be fulfilled, the testimony about the size of the casket is largely irrelevant.[40] The trial court would not have to conclude that Moore would indeed fit inside the casket that Jackson had, to conclude that such a threat constituted domestic violence.

---

[40] Having examined the pictures of the casket, it is difficult to determine how large it is simply by comparing it to the other items depicted in the pictures. The trial court asked defense counsel if anyone had measured the casket and learned that the investigator who had taken the pictures had not done so. The positioning of a person standing next to the casket gives some idea of its size and construction, but Horton stated this was deceptive. The boards that form the sides of the casket appear to be made of thick bonded plywood and the construction appears to be sturdy. The second picture depicts the edge of one piece of plywood which shows that it is composed of five-core plywood. While the casket does not appear large enough to fit an average person lying flat and fully extended, it does appear that it could possibly accommodate a person who was "curled up" in the fetal position or "jammed" in it as it is wider at one end. We observe the fact that even if the casket was originally made to be a Halloween decoration, this does not negate that it could also be used as a visual threat to Moore.

33

The trial court should have made findings as to whether these incidents occurred as this was highly relevant to its later determination as to whether Moore was eligible for the domestic violence exemption. If the trial court were to believe Moore's testimony as to even some of the past incidents of domestic violence and abuse that Moore testified occurred, it could further appropriately conclude that these incidents had "some connection" to her shooting Jackson. Thus, Moore could satisfy her burden without the trial court believing her potentially more self-serving testimony about the events which occurred closely in time with Moore shooting Jackson.

**D. Relevant Considerations Regarding Resolving Credibility and Whether Corroboration Is Required**

In making credibility determinations against Moore regarding the events in the trailer the night before the shooting and the shooting itself, the trial court appears to have rejected Moore's account on the basis that these specific events required corroboration for her to be credible. There is no such requirement.

Moore's testimony provided substantial support to her entitlement to the exemption. While we recognize that corroborating evidence can aid a fact finder in determining credibility, a victim's testimony alone is sufficient to convict a defendant of a crime. *Solomon v. Commonwealth*, 277 Ky. 828, 127 S.W.2d 868, 872 (1939); *Whitaker v. Commonwealth*, 95 Ky. 632, 27 S.W. 83, 83–84 (1894). If one person's testimony can establish that a crime occurred beyond a reasonable doubt, a defendant witness can certainly establish by her testimony

34

an entitlement to the exemption under the "some connection" standard without any other support.

Additionally, the trial court failed to consider Moore's credibility regarding her testimony about a long history of Jackson committing domestic violence against her. If she was credible as to those circumstances, could be relevant to determining her credibility as to later events. The trial court needed to consider all the evidence before it judged Moore's credibility to determine if there was "some connection" between the crime and past domestic violence.

Generally, there are no witnesses to domestic violence and only the abuser and the victim of domestic violence know what has occurred. Moore can hardly be faulted for failing to call the drug dealers that may have witnessed Jackson threatening her and choking her into unconsciousness before Jackson tied her up and gave them permission to rape her in exchange for drugs.

However, Moore did provide some corroboration to her testimony. Moore called Johnson who testified about his observations regarding one incident of domestic violence. Moore supported her testimony about Jackson's threats to bury her alive with pictures of the casket with her nickname written on it and Horton's testimony confirmed that such a casket was indeed in Jackson's possession.

Moore also provided an expert who corroborated her actions as being typical for domestic abuse survivors and justified by the situation. We caution trial courts against too quickly discarding an acknowledged expert's testimony in that expert's area of expertise *in toto.*

Dr. DeKeresedy's testimony provided some basis for assessing Moore's credibility regarding her testimony about returning to her abuser, failure to contact the police, failure to file to receive an EPO and DVO, and the threat she reasonably believed Jackson posed to her. Dr. DeKeseredy specifically agreed that Moore shooting Jackson was "intertwined" with the past domestic violence Jackson inflicted on Moore. The Commonwealth offered no expert to counter Dr. DeKeseredy's testimony. Accordingly, the trial court was incorrect in its analysis that Moore could not meet her burden of proof because it did not find her testimony to be credible concerning the shooting and the events leading up to the shooting. The trial court erred in failing to consider Dr. DeKeresedy's expert testimony in this light.

As to Dr. DeKeresedy's conclusions which were formed from talking with Moore and the information he was provided from defense counsel, we note that it is common knowledge that such information generally includes all pertinent discovery, which the expert can analyze from the perspective of that expert's area of expertise to form an expert opinion even if the underlying information would not be admissible. Kentucky Rules of Evidence (KRE) 703(a). Dr. DeKeresedy had a valid basis for analyzing whether Moore was being truthful based on his knowledge of how victims of domestic violence behave, how her story fit together, and how she described her reactions to various events. Ultimately, however, the trial court could properly make a credibility determination against Dr. DeKeresedy regarding matters where he relied upon

36

the information he was provided by Moore and defense counsel in forming his opinion.

However, the trial court could not properly reject the entirety of Dr. DeKeresedy's testimony as being "of little value in this case" because he "only interviewed Moore" and "assumed her version of the events to be true[.]" Such reasoning cannot justify the trial court's wholesale disregard of his unchallenged expert testimony about how domestic violence victims behave, the real risks they face in leaving, and how such past abuse informs their actions.

Dr. DeKeresedy testified that it was very common for victims of domestic violence to leave and return multiple times because they correctly believe their abuser will kill them if they leave permanently. He also explained that domestic violence survivors rarely call the police. This testimony mattered in resolving what happened and whether Moore's testimony about her behavior was consistent with these patterns. The Commonwealth did not attempt to challenge the accuracy of such testimony during cross-examination, and it also did not call its own expert to testify.

Additionally, the types of domestic violence that Moore testified Jackson inflicted on her are consistent with and characteristic of established patterns of domestic violence, with a pattern of strangulation greatly elevating her risk that she would be killed by Jackson. This consistency could aid the trial court in its determination as to whether she was credible in her account.

The trial court was *not* required to believe Moore's testimony was wholly credible as to the inciting incident or how the shooting took place, to conclude that her actions had "some connection" to the domestic violence Jackson inflicted on her. The trial court might largely discard Moore's account regarding the specific inciting incident that Moore described[41] and her account of the events surrounding the shooting, perhaps even believe that Moore shot Jackson in cold blood the minute he opened the trailer door and then concocted a story to claim self-defense, but still could conclude past domestic violence qualified her for the exemption.

Moore could have but was not required to call any witnesses as to the events of the night before in the trailer and there were no witnesses to call as to the shooting. It would be inappropriate for the trial court to find Moore's testimony less credible because Moore could not call Erika to corroborate the inciting incident. The defense attempted to call Erika but was unable to serve her, reported this fact to the trial court, and this representation was corroborated by the record which showed she was unable to be served.

We do not consider Erika's recorded statement to the police, that Jackson raped her the night before he was killed and Moore was afraid of Jackson, as it is only in the record by avowal. If this statement had been

---

[41] The trial court alternatively might believe there was some kind of inciting incident the night before (although not necessarily the exact one that Moore testified occurred) which was related to the shooting because it triggered a reaction in Moore based on the history of domestic violence and abuse.

admitted, it would have been highly relevant as it would have provided some corroboration of Moore's account.

The failure by either side to call the other people whom Moore testified were in Jackson's trailer but left before Jackson raped Erika is not particularly helpful for determining if Moore was being honest about what occurred. If Moore was to be believed, they would have no useful information about this inciting event. However, if the other people were present during the requisite time period, the Commonwealth's failure to call these witnesses to contradict Moore implicitly undercuts its position that the rape did not occur.

Each case must be considered on its own merits under the totality of the evidence, and the fact that there was corroborating physical evidence in *Crowe* and *Roberts* does not mean that such corroboration is required. Indeed, many types of domestic violence do not leave any physical marks.

Even though Moore had the burden of proof, the trial court needed to consider that the Commonwealth did not present *any* evidence that directly contradicted Moore's testimony. The trial court could have fully believed the testimony of Horton and Lieutenant Edwards without finding it to contradict Moore's testimony at all. We observe that while Horton testified that she did not see any domestic violence, that is certainly not definitive proof that it did not occur when she was not there.

Lieutenant Edwards's testimony about his failure to observe marks on Moore's face, hours after Jackson was killed when Moore testified he hit her just before she shot him, was open to multiple interpretations: Jackson did not

39

hit Moore, Jackson hit Moore but did not strike her hard enough to cause a visible injury which could be seen hours later, Jackson hit Moore and caused an injury but it was not obvious to the detective, Jackson hit Moore and it caused a visible injury but the detective failed to note it despite it being his customary practice to do so. We note that Moore did not claim to be injured by this blow.

**E. Remedy on Remand**

It is well established at this juncture that the trial court erred in its analysis. Thus, the only question which remains is what must occur on remand.

The Court of Appeals instructed the trial court to enter "an order finding Moore is entitled to the exclusion in KRS 439.3401(5) for victims of domestic violence from the parole restrictions for violent offenders." We disagree with the Court of Appeals' remedy.

The Court of Appeals overreached in its remand language as it cannot substitute its own factual findings for the trial court's missing factual findings, and reach a conclusion based on such findings. The *de novo* standard of review on the second prong as set out in *Crowe* does not empower the Court of Appeals to make its own factual findings or resolve issues as to witness credibility. We specifically clarified this matter in *Crowe* by quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996), for the proposition that despite the application of the *de novo* standard of review, "appellate courts shall 'give due

40

weight to inferences drawn from those facts by resident judges[.]'" *Crowe*, 610 S.W.3d at 225.

When reviewing the second prong, our appellate courts must accept the trial court's underlying factual findings, including appropriate inferences and credibility determinations, under the typical clear error standard as it is the "facts" portion of this mixed issue of facts and law. What the *de novo* standard of review allows our appellate courts to do is to review the *ultimate legal conclusion* which results from the trial court's underlying factual findings. *See Roberts*, 599 S.W.3d at 854-57 (reversing the denial of the exemption because our Court disagreed with the conclusion the trial court drew from the overwhelming facts of domestic violence). Therefore, it is appropriate to reverse the Court of Appeals to the extent that it substituted its factual findings for those of the trial court and mandated a specific outcome.

The lack of sufficient factual findings and the trial court's misunderstanding of the relevant legal standards that must be satisfied to qualify Moore for the domestic violence exemption, requires that we vacate the trial court's order denying the domestic violence exemption and remand for it to make appropriate and sufficient factual findings. In doing so, the trial court as factfinder is certainly allowed to consider the credibility of Moore and the other witnesses and can properly believe or disbelieve their testimony in whole or in part. *See Commonwealth v. Anderson*, 934 S.W.2d 276, 278 (Ky. 1996). After the trial court makes all the needed factual findings, the trial court will then consider anew under the totality of the evidence whether Moore qualifies

for the domestic violence exemption under the "some connection" standard. The trial court may order a new hearing, in its discretion, if this would be helpful for it to resolve this matter.

### III. CONCLUSION

The domestic violence exemption arose from a comprehensive attempt to reform how Kentucky deals with domestic violence. By adopting many of the Task Force's recommendations, our General Assembly grafted in exceptions to our law that recognize that domestic violence and abuse victims who subsequently kill or injure their abusers in an act which bears "some connection" to the domestic violence and abuse they have suffered are not as culpable as others, and do not pose the same threat to the general public.[42] A determination that a defendant qualifies for the domestic violence exemption also aids in rehabilitative goals as it informs prison officials that such an inmate requires specific rehabilitation related to intimate partner violence.

The domestic violence exemption does not guarantee that a particular inmate serving her sentence will rejoin society sooner. Instead, it gives such an inmate the opportunity to be considered for parole earlier than other violent offenders but leaves the matter of whether she will be paroled in the discretion of the parole board. There is no obligation for the parole board to grant anyone parole. Even should the trial court grant Moore the exemption, she may still have to serve every day of her sentence.

---

[42] *See generally* Zamouri, *supra* note 26.

In considering whether to grant the exemption, trial courts should keep in mind the ultimate goals behind the exemption and the practical limitation of such a designation. We urge trial courts to carefully consider the entire history between the defendant and the victim in adjudging whether the crime has "some connection" to a past history of domestic violence and to be generous in granting the exemption when appropriate.

We affirm the Court of Appeals in part and reverse in part, vacate the Laurel Circuit Court's order denying Moore the domestic violence exemption, and remand for the trial court to engage in further factual findings, and base such findings on the pertinent legal standards, determine anew whether Moore has proven "some connection" between the domestic violence that she suffered and her killing of Jackson, thereby qualifying her for the domestic violence exemption.

Lambert, C.J.; Bisig, Conley, Keller, Nickell, Thompson, JJ., sitting. Lambert, C.J.; and Keller, J., concur. Conley, J., concurs by separate opinion. Nickell, J., concurs in result only. Bisig, J., concurs in part and dissents in part by separate opinion. Goodwine, J., not sitting.

CONLEY, J., CONCURRING: I have no issue with the substantive outcome in this case, as I believe the Court is consistently interpreting the domestic violence exemption, and related statutes, as the General Assembly has declared and intended. That being said, the Court has commented at significant length regarding domestic violence and the behavior of domestic violence victims. In light of these comments, I believe the possibility the trial

43

court on remand will *not* conclude Moore qualifies for the domestic violence exemption to be purely abstract and theoretical. We have decisively stated domestic violence need not be the sole or even the primary cause with regard to her killing of Jackson. We have decisively stated no act of domestic violence need be contemporaneous with her killing of Jackson. And the Court has even stated that Moore could have "shot Jackson in cold blood the minute he opened the trailer door and then concocted a story to claim self-defense," and still qualify for the domestic violence exemption.

It is clear to me then that the bar for qualifying for the domestic violence exemption is extremely low. Indeed, I doubt our case law accurately reflects reality in light of the above. Technically, Moore needs to demonstrate first, that she is a domestic violence victim; and second, that the domestic violence has some connection to the charged crime. *Gaines v. Commonwealth*, 439 S.W.3d 160, 164 (Ky. 2014). But given the extremely low threshold for the second prong of this test, I doubt it represents anything more than a *pro forma* procedural hurdle. In brief, under the law elucidated (and again, I concur with the Court) all that really matters is the defendant establish she is a domestic violence victim. So long as the defendant's victim was the perpetrator of that domestic violence, I find it virtually impossible that a trial court could ever conclude the domestic violence was not in connection with the crime given the standard affirmed by the Court.

Finally, Moore is a female, and the Court spends all its words speaking of domestic violence in the context of male perpetrators and female victims.

44

Women are undoubtedly the majority of domestic violence victims, but to read the Court's opinion one would think they exclusively suffer from domestic violence. This is simply not true. Since 1980, "more than 100 studies of violence between dating, cohabiting, and married couples, including national household surveys in the United States and other countries . . . indicate that women are at least as likely as men to perpetrate violence against their partners." Amanda J. Schmesser, *Real Men May Not Cry, but They Are Victims of Domestic Violence: Bias in the Application of Domestic Violence Laws*, 58 Syracuse L. Rev. 171, 182 (2007). A 1975 study demonstrated that "men and women are at equal risk of being physically assaulted by their partners in marital relationships." *Id.* at 185. Statistically, women suffered domestic violence from their male partners in 121 out of 1,000 couples. *Id.* at 186. Men suffered domestic violence from their female partners in 116 out of 1,000 couples. *Id.* These findings were replicated in 1985. *Id.* Since then there have been "hundreds of studies which have found that women are just as likely . . . to perpetrate violence against their intimate [male] partners." *Id.* at 189.

Moreover, a 1998 Department of Justice study "indicates men are victims of domestic violence thirty-nine percent of the time, or 834,732 men are victims each year." Melody M. Crick, *Access Denied: The Problem of Abused Men in Washington*, 27 Seattle U. L. Rev. 1035, 1043 (2004). Roughly one-in-five men report unwanted sexual contact. Philip N.S. Rumney, *In Defence of Gender Neutrality Within Rape*, 6 Seattle J. for Soc. Just. 481, 501 (2007). And two studies, one in America and the other in Scotland, consistently found between

45

7.4% and 8% of men have experienced domestic violence. Korey Lewis, *The Road to Inequality Is Paved with Good Intentions: The Effect of Language in Domestic Violence Statutes on Male Victims*, 83 UMKC L. Rev. 789, 792 (2015).

Finally, we cannot elide over the reality of domestic violence in same-sex couples. Research indicates gay and lesbian couples experience domestic violence at the same or greater frequency than heterosexual couples. Luca Rollè et. al., *When Intimate Partner Violence Meets Same-Sex Couples: A Review of Same Sex Partner Violence*, Front Psychol. (28 August 2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6113571/. Summarizing the results under the heading "intimate partner violence (IPV)", the study reveals

> Life-time prevalence of IPV in LGB couples appeared to be similar to or higher than in heterosexual ones: 61.1% of bisexual women, 43.8% of lesbian women, 37.3% of bisexual men, and 26.0% of homosexual men experienced IPV during their life, while 5.0% of heterosexual women and 29.0% of heterosexual men experienced IPV. When episodes of severe violence were considered, prevalence was similar or higher for LGB adults (bisexual women: 49.3%; lesbian women: 29.4%; homosexual men: 16.4%) compared to heterosexual adults (heterosexual women: 23.6%; heterosexual men: 13.9%).

Thus, while I certainly share the Court's concern for female victims of domestic violence suffered from male perpetrators, we ought not lose sight of the indisputable evidence that men also suffer domestic violence, from both men and women; and women suffer from and inflict domestic violence upon both men and women. Domestic violence is a human phenomenon, and our laws are not (and cannot be lest we violate equal protection) written solely for the benefit of female victims.

BISIG, J., CONCURRING IN PART & DISSENTING IN PART: I concur with the well-written Majority Opinion insofar as it holds the trial court erred in finding Moore ineligible for the domestic violence exemption. However, I would affirm the Court of Appeals in full, including its decision to remand the matter to the Laurel Circuit Court with instructions to find that Moore is entitled to the exemption.


COUNSEL FOR APPELLANT:

Russell Coleman
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General


COUNSEL FOR APPELLEE:

Aaron Reed Baker
Assistant Public Advocate